**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al. and Patricia Parisi et al., Plaintiffs,**

v.

**Hugh L. CAREY, Individually and as Governor of the State of New York, et al., Defendants,**

**United States of America, Amicus Curiae.**

**Thomas A. COUGHLIN III, Individually and as Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities, Third-Party Plaintiff,**

v.

**BOARD OF EDUCATION OF the CITY OF NEW YORK, Frank J. Macchiarola, and Charles I. Shonhaut, Third-Party Defendants.**

Nos. 72–C–356, 72–C–357.

United States District Court, E. D. New York.

Sept. 14, 1978.

New York Civil Liberties Union, Mental Health Law Project, Kalman E. Finkel, Legal Aid Society, Civil Appeals & Law Reform Unit, Protection and Advocacy System for Developmental Disabilities, Inc., New York City, for plaintiffs; Christopher A. Hansen, Carol B. Kellerman, New York City, Jay Shusterhoff, of counsel.

LeBoeuf, Lamb, Leiby & MacRae, Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants; Taylor R. Briggs, A. Seth Greenwald, Asst. Atty. Gen., New York City, of counsel.

William A. Carnahan, Deputy Commissioner and Counsel, Albany, N. Y., for Office of Mental Retardation and Developmental Disabilities of the State of New York.

Allen G. Schwartz, Corp. Counsel, New York City, George Shebitz, Bd. of Ed., Legal Dept., New York City, for third-party defendants; Robert S. Deutsch, New York City, Mary C. Tucker, Brooklyn, N. Y., of counsel.

United States Dept. of Justice, Civil Rights Div., Washington, D. C., for amicus curiae; Lucy L. Thomson, Washington, D. C., of counsel.

Willowbrook Review Panel, New York City, also present; Michael Lottman, Washington, D. C., Murray B. Schneps, New York City, of counsel.

BARTELS, District Judge.

## MEMORANDUM–DECISION and ORDER

This is a motion brought by order to show cause signed September 8, 1978, by third-party plaintiff, New York State Office of Mental Retardation and Developmental Disabilities Commissioner Coughlin, to join to this action third-party defendants, New York City Board of Education, Board of Education Chancellor Macchiarola, and Charles I. Shonhaut, Acting Executive Director of the Division of Special Education and Pupil Personnel Services of the Board, and for preliminary and permanent injunctive relief. Hearings were held on Monday and Tuesday, September 11 and 12, 1978, at which all the pertinent evidence was adduced, so that it is possible for the court to adjudicate the motion for permanent injunctive relief at this time without more.

The principal action of *New York State Ass'n for Retarded Children, Inc. v. Carey* was brought under 42 U.S.C. § 1983 on behalf of a class of mentally retarded residents of Willowbrook Developmental Center (now Staten Island Developmental Center). The major points of contention were settled by a Consent Judgment, the thrust of which is to require the defendants to place the class members in the community in the least restrictive environment and arrange programs for them in the community so that they develop their potential and live as normal a life as possible.

In furtherance of this mandate, the defendants, under the primary supervision of Commissioner Coughlin, have placed a number of children in family homes and community residences and have arranged for them to attend special education programs in the public schools under the jurisdiction of the Board of Education.

Under circumstances which will appear below, the Board of Education identified fifty pupils in its Track IV (severely and profoundly mentally retarded) special education programs who happened to be carriers of hepatitis B. The Board of Education, on September 7, 1978, suddenly ordered these carriers to be excluded from the public schools, planning to arrange for their education in developmental center schools under the jurisdiction of the New York State Office of Mental Retardation and Developmental Disabilities. Forty-two of these carriers are members of the Willowbrook class. Commissioner Coughlin, who is obligated by the Consent Judgment to place and maintain these class members in the

least restrictive environment possible, commenced this ancillary proceeding on behalf of these forty-two carriers in order to gain their readmission to the public schools.

## Standing and Jurisdiction

■ As a result of concerns expressed by the Court with respect to its ancillary jurisdiction over the Commissioner's action against the Board of Education and with respect to the Commissioner's standing to assert the constitutional and statutory rights of the plaintiff class members, counsel for plaintiffs stated that not only do they fully support the action of the Commissioner, they also believe it appropriate for the Commissioner to take the lead in insuring that the rights of the mentally retarded under his jurisdiction are respected. To support their position, plaintiffs have filed a class action complaint on behalf of not only the forty-two class member carriers but also the additional few non-Willowbrook class member carriers who have also been excluded. By separate order, this class action has been certified and consolidated with the Commissioner's ancillary proceeding here. In view of the foregoing, we believe that any problems with respect to the standing of the Commissioner to enforce the rights of the class members here involved have been eliminated.

■ There is no dispute as to the subject-matter jurisdiction over the controversy. Paragraph 4 of the Willowbrook Consent Judgment states that:

> This judgment and Appendix "A" hereto shall be applicable to and binding on the defendants and their successors, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise.

Even if the New York City Board of Education is not bound by the Consent Judgment by virtue of this paragraph, the Court has ancillary jurisdiction to decide the instant controversy under otherwise applicable rules of substantive law. See N.Y.S.A.R.C., Inc. v. Carey, 438 F.Supp. 440 (E.D.N.Y.

1977). In addition, the court has jurisdiction under 28 U.S.C. § 1343(3) and 20 U.S.C. § 1415(e) to adjudicate claims under the federal constitution, § 504 of the Rehabilitation Act of 1973, and the Education for All Handicapped Children Act of 1975. Pendent jurisdiction may appropriately be exercised over the state educational law claims.

## The Hearings

At the hearings the Court heard the testimony of a number of medical doctors, experts in the provision of care to the mentally retarded, and experts in the education of the mentally retarded. By the end of the proceeding it was apparent that there is little dispute as to the underlying facts with respect to the communicability of hepatitis B among mentally retarded schoolchildren; the real differences are in how the risks of communication are to be balanced against the traumatic effect of sending children to school in developmental centers. We may thus set forth with a certain degree of confidence some background on the nature and epidemiology of hepatitis B.

Hepatitis B is a virus which may ultimately have a debilitating effect on the liver. When introduced into a susceptible person, the virus undergoes a long period of incubation, generally two to three months. The acute stage, which is a rather rare phenomenon, is sometimes accompanied by jaundice and inflammation of the liver and in some cases may be very serious and even lead to death. There is no known cure for hepatitis B, although optimism was expressed as to the development of an effective vaccine within the next four years. In other cases, however, particularly among children, the acute phase of hepatitis B may be very mild and be mistaken for a passing flu and fever.

Most of the concern expressed in court focussed not on the dangers attendant to the acute stage of the disease, but on the "carrier" stage. Evidently, after infection with hepatitis B, one of two things can happen. In one case, if the patient has built up enough antibody, the hepatitis B

virus or "antigen" will be eliminated. The antibodies will remain, and the patient will be immune for an indefinite period of time. Immunity, therefore, implies past experience with the disease. In the other case, the patient does not create antibodies, or sufficient antibodies, to eliminate the hepatitis B antigen. Under these conditions, an equilibrium is reached where the patient appears clinically to be healthy, and yet, upon examination, will be found to have the antigen in his blood. Such persons are known as carriers. Thus, one carrier can transmit the hepatitis B antigen to another, who may also become a carrier, without either having passed through the acute stage of the illness. At Willowbrook, where almost all residents contracted the disease, approximately 30% of the residents are now immune and approximately 60% are carriers. There was some difference in emphasis among the different doctors who testified with respect to the seriousness of the carrier stage, in that Dr. Ziring and others called by the Commissioner stressed the essentially healthy condition of a carrier, while Dr. Bakal, called by the Board of Education, stressed that carriers were indeed sick, and that over the long run, perhaps twenty years, a carrier may undergo severe debilitation.

The epidemiology of hepatitis B was discussed at length during the hearing. Unlike hepatitis A, which is highly contagious, hepatitis B is of limited communicability. It is generally communicated solely by the parenteral, or blood-to-blood route, by means of transfusions of infected blood, or by use of a contaminated needle. Long believed to be found only in the blood, or in body fluids where blood is present, recent studies indicate that hepatitis B antigen may also be present, on occasion, in saliva. Dr. Bakal testified with respect to one study he had read where the disease was experimentally transmitted by placing infected saliva into the mouth of a recipient. However, according to a Center for Disease Control study issued in May 1976,

> [a]lthough [hepatitis B antigen] has been detected in many human biological fluids during acute infection, transmission of disease by saliva or other body fluids containing antigen has not yet been convincingly demonstrated.

United States Public Health Service, Center for Disease Control, *Morbidity and Mortality Weekly Report,* Vol. 25, No. 17, May 7, 1976, at 4.

As a result of concerns which surfaced last school year when a special education teacher became infected not with hepatitis B but with hepatitis A, the New York City Department of Health sent observers to the special education classes in the affected school. There sufficient unhygienic personal behavior was observed to warrant a further study by a Department of Health task force of nine hepatitis B experts. Accordingly, under the coordination of Dr. Bakal, all of the children in the Track IV programs where a known hepatitis B carrier was present for most or all of the school day were slated for study. (Forty-four children were already known to be carriers because they had come from Willowbrook, where they had undergone testing.) The total sample numbered approximately 450 children. Of these, approximately 120 had come from institutions where they had been previously tested, and Dr. Bakal did not subject these children to further testing, even though he was able to obtain blood records for only 70 to 80 of these. Of the remaining children, approximately 270 were tested, giving a total of approximately 340 test results out of the original 450 sample. The results indicated that in addition to the forty-four known carriers, there were five additional carriers. It is not known, nor does it appear that it could ever be discovered, exactly how these five persons contracted the disease. Suspicion, however, then focussed on the forty-four known carriers, but there was no direct proof that the five new carriers contracted the disease as a result of contact with the known carriers.

As mentioned above, the children involved exhibit behavior which justifiably gives rise to concern with respect to the communication of hepatitis B. In particular, Dr. Bakal observed on a number of occasions the mouthing of objects by the

children, interpersonal hand-to-mouth contact, scratching which drew blood, drooling, and bleeding at the gums (a common side effect of an anti-epilepsy drug), and was told by teachers of instances of self-abuse where children would have blood on their hands. The amount of such unhygienic contact was difficult to quantify, but Dr. Bakal estimated that, based on his observations and discussions with teachers, of the thirty-three carriers actually studied, twenty-seven had exhibited unhygienic contact with others with some frequency over the prior six months. On any given day, perhaps one or two of the children would have blood on their hands. A special education supervisor who had experience in teaching special education programs also stated that there was a considerable amount of such unhygienic contact. On the other hand, Ms. Kathy Schwaninger, Executive Director of the Willowbrook Review Panel, who has fifteen years of experience in the provision of care to mentally retarded children and who has evaluated over one hundred special education programs, testified that in a highly structured classroom with carefully planned activities, such behavior could be controlled. Ms. Schwaninger also taught mentally retarded children for two years; during one year Ms. Schwaninger taught a class of ten to thirteen adolescent boys by herself, and during the other year she taught a class of ten to thirteen younger children with an aide.

Upon completion of the above-mentioned study, the Department of Health task force issued a set of guidelines for the management of hepatitis B carriers in special education classes. A preliminary draft was issued in February 1978, and after comments were received, a second set was issued on August 14, 1978. These guidelines called for the students to be tested at appropriate intervals and for their classification as carriers, immunes or susceptibles. After classification, the pupils would then be "cohorted," or grouped within the public schools. Susceptibles were to eat lunch apart from carriers and, if their parents desired, were to be taught in classes and classrooms separate from the carriers. Susceptible children were also to be supervised on schoolbusses to minimize hazardous contact with other children. Teachers were to be advised of the presence of a carrier and were to be instructed in the management and prophylaxis of carriers. Good personal hygiene and cleansing of environmental surfaces were stressed, and unhygienic personal contact among the children was to be discouraged. Handwashing facilities were to be available in each classroom, and wounds and breaks in the skin were to be treated and covered. These guidelines reflect the Department of Health's balancing between the right of mentally retarded children to an education in the most helpful and least restrictive environment possible, and the right of all persons to be educated in an environment free from potential disease.

The United States Public Health Service, Center for Disease Control, has also considered the problem of control of hepatitis B, including its transmission in institutions for the mentally retarded. Its position, which is also that of the New York State Office of Mental Retardation and Developmental Disabilities, is that "[i]n general, and until more definitive information on the infectiousness of persons with [hepatitis B antigen] becomes available, it is important to avoid placing unwarranted limitations or restrictions on [hepatitis B antigen]-positive retarded persons." Control measures suggested are essentially those of good hygienic practices, no sharing of personal toilet articles, and careful handling of blood-contaminated items. "No other restrictions need be imposed on antigen-positive residents when they participate in routine activities such as special education programs and in nursery, day care, or foster care facilities." Personnel in contact with carriers should be informed of the risk and instructed in the care of carriers, but "[hepatitis B antigen]-positive persons should be given the same consideration for placement programs . . . as those who are negative." Morbidity Report, supra, at 7–8.

*Consequences of the Action by the Board of Education*

Instead of following the New York City Department of Health's guidelines or the

less restrictive procedures advocated by the United States Public Health Service or the OMRDD, the relative merits of which are not otherwise before the Court, the Board of Education adopted the present course of action which none of the medical experts countenance. In fact, the Board's action is contrary to the guidelines adopted by the authorities. The Board's exclusionary policy will keep carrier pupils out of public education for an indefinite period of time, in fact permanently, under the policy, and there are no plans for the return of the children to the school system. It appears from the testimony of the Assistant Superintendent of the Board of Education for the Division of Special Education and Pupil Personalities, Ms. Coppin, that this was done in part because the Board felt the schools could not comply with the Department of Health's guidelines, and because of parental pressure, fear of publicity and of lawsuits, union and staff pressure, and so forth. These obstacles, real as they may be, cannot be allowed to vitiate the rights of these handicapped schoolchildren. *See Brown v. Board of Education,* 349 U.S. 294, 299–300, 75 S.Ct. 753, 99 L.Ed. 1083 (1954).

It appears to the Court that the Board of Education has overreacted to the problem of hepatitis B contagion in its special education classes, and that this overreaction has caused and will continue to cause irreparable harm to the children involved. In testimony to which this Court must accord great weight, the Commissioner and other witnesses in his behalf stressed the deleterious effect that the Board's exclusionary policy has on the children affected. These children have long been prepared for their entry into more normal community activities and placements and have been told that this is a very important step. The traumatic effect of being told at the last minute that they can no longer participate in the schools where many of them have already spent two or three years is extremely great. To this must be added that due to the timing of the Board's action, no interim programs could be developed, and many of the excluded children are simply remaining home while their peers and co-residents go to school. However, the most serious consequences of the Board's plan would be felt if the pupils were sent to school in developmental centers. The Court is convinced that this would have a severely retrogressive effect on the development of these children, and would be an enormous setback to the process of normalization of these children. The Board's policy would also be a serious setback to implementation of the Willowbrook Consent Judgment.

The argument of the Board that because the Track IV children have little contact with normal children in the public schools, they would not be harmed by the complete absence of such contact in developmental center schools, must be entirely rejected. Association with normal persons is the primary means by which mentally retarded persons improve and develop, and its importance cannot be overestimated. Conversely, retarded persons who associate primarily with other retarded persons generally adopt retrogressive behavior patterns and will usually deteriorate. It is for this reason that the Staten Island Developmental Center is being ordered emptied. The trauma of returning these children to developmental center schools must also be emphasized. With these considerations in mind, we now turn to the applicable principles of law.

*Applicable Law*

We have seen that the Board of Education, which concededly receives federal financial assistance under the Education for All Handicapped Children Act, has excluded mentally retarded children who are hepatitis B carriers from public school programs for which they are otherwise qualified. The Board of Education has no plans to exclude normal children who are hepatitis B carriers. The justification for such discrimination is that there is a danger of communication of hepatitis B among mentally retarded children because of their behavior which does not exist for normal children.

■ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, states:

No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

A private cause of action exists under this statute. *Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977). Under the circumstances of this case, where time is of the essence in insuring that these mentally retarded children are provided adequate programs, we believe it unwarranted to defer to administrative enforcement of the statute, as might otherwise be required. *See Doe v. New York University,* 442 F.Supp. 522 (S.D.N.Y.1978); *Crawford v. University of North Carolina,* 440 F.Supp. 1047 (M.D.N.C.1977).

■ In *Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir. 1977), the Court of Appeals stated: "[a]s we read § 504, however, exclusion of handicapped children from a school activity is not improper if there exists a substantial justification for the school's policy." Based on the evidence we have heard, we find that the risk of contagion of hepatitis B among mentally retarded children is not substantial enough to justify their discriminatory exclusion from public school. The risk of contagion cannot be ignored, but there are prophylactic measures, not necessarily as stringent as those of the Department of Health, which can be taken in order to reduce the risks to a *de minimis* level. It is not necessary to close the schoolhouse door to these children.

■ We also believe that the Board of Education has violated the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401 *et seq.,* and N.Y.Educ.L. §§ 4401 *et seq.* We are aware that 20 U.S.C. § 1415 and N.Y.Educ.L. § 4404 contemplate an administrative determination of the appropriate placement of the child before any judicial review is to be taken. However, both N.Y.Educ.L. § 4404(4) and 20 U.S.C. § 1415(e)(3), as well as the N.Y.S. Education Commissioner's regulations, 8 N.Y.C.R.R. § 200.5(b)(1)(viii), contemplate that the status quo will be maintained pending objection to the proposed change upon timely notice to the parent. However, the Board of Education implemented its change with last minute notice to the parents and has even been granted a sixty-day "waiver" of the Commissioner of Education's regulations with respect to hearings. Under the circumstances, we believe it is appropriate to proceed directly to the *de novo* review of the administrative action permitted by 20 U.S.C. § 1415(e)(2).

■ N.Y.Educ.L. § 4402(2)(a) states that:
The board of education or trustees of each school district shall be required to furnish suitable educational opportunities for handicapped children by one of the special services or programs listed in subdivision two of section forty-four hundred one. The need of the individual child shall determine which of such services shall be rendered.

*See also* 20 U.S.C. § 1412(5)(B). For years the needs of these hepatitis B carrier children were satisfied without objection in special education classes. The needs are the same, but the children are now excluded for reasons which the hearing has shown to be unjustified and which are in direct opposition to the children's needs. The Board's overreaction to the hepatitis B problem is not countenanced by the law. We also believe that the Board's action violates the provisions of the Consent Judgment and the constitutional rights of the children to equal protection and due process of the law.

In sum, we find that upon taking simple prophylactic and classroom management measures which it is in the Board of Education's power to take, there is no substantial risk of communication of hepatitis B from carrier pupils in the Track IV special education programs that justifies their discriminatory exclusion from the benefits of a public school education, particularly in view of the unavoidable and irreparable harm such exclusion would work on the students involved. The foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Fed.R.Civ.P. 52(a).

For the above reasons, it is hereby

ORDERED that the third-party defendants be joined to this case for the limited purpose of adjudicating the instant controversy; and it is further

ORDERED that the third-party defendants are permanently enjoined from excluding the Willowbrook class members from

the New York City public school system on the basis of their status as carriers of hepatitis B; and it is finally

ORDERED that the third-party defendants readmit the excluded members of the Willowbrook class to the public school system in accordance with the procedures utilized for the general student population as a whole.