NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC., et al., and Patricia Parisi et al., Plaintiffs,

v.

Hugh L. CAREY, Individually and as Governor of the State of New York, et al., Defendants,

United States of America, Amicus Curiae.

Thomas A. COUGHLIN III, Individually, and as Commissioner of the Office of Mental Retardation and Developmental Disabilities, Third-Party Plaintiff,

v.

BOARD OF EDUCATION OF the CITY OF NEW YORK, Frank J. Macchiarola and Charles I. Schonhaut, Third-Party Defendants.

Christine WEST, on behalf of her son Mark West, a minor, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

BOARD OF EDUCATION OF the CITY OF NEW YORK, Frank J. Macchiarola, et al., Defendants.

Nos. 72–C–356, 72–C–357 and 72–C–2039.

United States District Court, E. D. New York.

Feb. 28, 1979.

488

New York Civil Liberties Union, Mental Health Law Project, New York City, Christopher A. Hansen, New York City, of counsel, Kalman E. Finkel, Legal Aid Soc., Civil Appeals & Law Reform Unit, New York City, Carol Kellermann, New York City, of counsel, for plaintiffs.

LeBoeuf, Lamb, Leiby & MacRae, New York City, Taylor R. Briggs, New York City, of counsel, for defendants.

Allen G. Schwartz, Corp. Counsel of the City of New York, New York City, Robert S. Deutsch, New York City, Mary C. Tucker, Brooklyn, N. Y., of counsel, George Shebitz, New York City, Bd. of Ed. Legal Dept., for third-party defendants.

U. S. Dept. of Justice, Civil Rights Division, Washington, D. C., Lucy L. Thomson, Washington, D. C., of counsel, for amicus curiae.

BARTELS, District Judge.

This is a motion pursuant to Federal Rule of Civil Procedure 57 by the New York City Board of Education ("the Board"), third-party defendant in this consolidated action, for a declaratory judgment establishing the validity of its proposed plan for segregating within the public schools certain mentally retarded children who are epidemiologically classified as carriers of hepatitis B virus.[1] This application is a sequel to the Memorandum Decision and Order of this Court dated September 14, 1978, wherein this Court enjoined the Board, Chancellor of the Board, Frank J. Macchiarola, and Acting Executive Director of the Division of Special Education and Pupil Personnel Services, Charles I. Schonhaut, from totally excluding the carriers from the public school system on the basis of their hepatitis B status, and further ordered the readmission of the excluded children to the public schools "in accordance with the procedures utilized for the general student population." *New York State Association for Retarded Children, Inc. v. Carey, et al.*, 466 F.Supp. 479 (E.D.N.Y.1978).

In response to the Court's decision and under circumstances which will appear more fully below, the Board thereafter convened a task force for the purpose of formulating a plan for the education of the retarded carrier children within the public

schools but in classes and activities separate from all non-carrier retarded children. A proposed plan was finalized by the Board in mid-October 1978, at which time it was presented to all other parties to this action for review. Upon their rejection of the proposal in early November and prior to its implementation in the schools, the Board initiated the instant application for a ruling that the plan is in accord with the 1975 Willowbrook Consent Judgment entered into by the parties to the principal action, *New York State Association for Retarded Children, Inc. v. Carey, et al.*, 393 F.Supp. 715 (E.D.N.Y.1975), and with all applicable laws, rules, and regulations. This motion is opposed by plaintiffs and other interested parties, including defendant and third-party plaintiff, New York State Office of Mental Retardation and Developmental Disabilities ("O.M.R.D.D.") Commissioner, Thomas A. Coughlin III, and the United States Department of Justice, as *amicus curiae*, on the ground that the Board's proposal is violative of various provisions of the Consent Judgment, § 504 of the Rehabilitation Act of 1973, as amended by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, 29 U.S.C. § 794, the Education of the Handicapped Act, as amended by the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401 *et seq.*, the New York State Education Law, §§ 4401 *et seq.*, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[2] Hearings were held on November 9, 14, 20, and 28, 1978, at which time all the pertinent evidence was adduced. Having considered

---

1. Viral hepatitis, type B, is a disease for which there is presently no known cure. Unlike the more commonly known hepatitis A, it is of limited communicability, though an increased risk of transmission is generally associated with crowded, often unhygienic conditions found in institutions. It is transmitted primarily by blood-to-blood contact, by means of transfusion of infected blood, or by use of a contaminated needle, although some experts believe, but have not conclusively established, that it may also be transmitted through body fluids other than blood, such as saliva or semen. Once infected with the virus, a person is classified as either a "carrier" or, where enough antibodies have been accumulated

within the body to eliminate the hepatitis B "antigen," an "immune." Those who have not been contacted by the virus are classified as "susceptible." If current expectations are correct, a preventive vaccine may be developed within the next several years. *See generally*, "Perspectives on the Control of Viral Hepatitis, Type B," United States Public Health Service, Center for Disease Control, *Morbidity and Mortality Weekly Report*, vol. 25, no. 17 [May 7, 1976].

2. In the interest of convenience, plaintiffs and third-party plaintiff will hereinafter be cited as "plaintiffs."

this evidence and the briefs submitted by the parties, the Court has reached the following opinion, which contains its findings of fact and conclusions of law.

## Jurisdiction

The jurisdiction of this Court over the Board's application is not seriously contested. In addition to its authority to oversee implementation of the above-mentioned Consent Judgment, *see New York State Association for Retarded Children, Inc. v. Carey*, 438 F.Supp. 440, 446 (E.D.N.Y.1977); *New York State Association for Retarded Children, Inc. v. Carey*, 466 F.Supp. at 482, this Court has jurisdiction under 28 U.S.C. § 1343(3) and 20 U.S.C. § 1415(e) to adjudicate claims under the Constitution and applicable provisions of federal law, and pendent jurisdiction may appropriately be exercised over the State educational law claims. *Id.* Plaintiffs initially questioned the existence of a case and controversy under Article III of the Constitution, which contention they subsequently withdrew. We believe that the Board's application for a declaratory judgment is a highly appropriate and commendable means to resolve the presently existing dispute between the parties, which, if not resolved prior to implementation of the proposed plan, could result in substantial administrative expense and, more important, irreparable disruption of the educational programs of the retarded children affected. The Declaratory Judgment Act was devised by Congress for precisely this type of situation. *See* 28 U.S.C. § 2201; Federal Rule of Civil Procedure 57; *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686 (1970).

We find also that, contrary to suggestion by the Board, all parties necessary to the adjudication of this action have been joined. Federal Rule of Civil Procedure 19(a); *Welsch v. Likins*, 550 F.2d 1122, 1130–31 (8th Cir. 1977); *Liquifin Aktienge-sellschaft v. Brennan*, 383 F.Supp. 978, 983–84 (S.D.N.Y.1974). Although as will become evident the Board relied heavily upon recommendations of the New York City Department of Health in devising the proposal in question, it is the validity of the Board's own action, not that of the Health Department, which must be adjudicated, and we reject the suggestion by the Board that the Department is an indispensable party. Even assuming that the Board could demonstrate that joinder of the Department of Health would be helpful in resolving the dispute, we fail to see how presentation of the Board's case would have been materially improved in view of the apparent willingness of Health Department personnel to testify—and of their actual testimony—on the Board's behalf not only at the hearings in November, but also at those in September. Any interest of the Department of Health was adequately represented by the Board.

## I. FACTS

### Background

The underlying civil rights action was instituted in 1972 under 42 U.S.C. § 1983 on behalf of a class of mentally retarded residents of Willowbrook Developmental Center (now Staten Island Developmental Center), alleging severely overcrowded and unsanitary conditions at the Center, significant shortages of sufficiently trained staff, and inadequate or non-existent medical and educational programs necessary to foster the habilitation and educational development of Willowbrook residents.[3] The major points of contention were settled in April 1975 by the Willowbrook Consent Judgment, which has since been modified by order of the Court on March 10, 1977 and September 15, 1978. The essence of the Consent Judgment is its mandate that defendants provide Willowbrook residents with the "least restrictive and most normal living conditions possible . . .," *Consent Judgment*, § A(1), and that defendants

---

**3.** Prior reported opinions in this case may be found at 357 F.Supp. 752 (E.D.N.Y.1973); 393 F.Supp. 715 (E.D.N.Y.1975); 409 F.Supp. 606 (E.D.N.Y.1976); 438 F.Supp. 440 (E.D.N.Y. 1977); 456 F.Supp. 85 (E.D.N.Y.1978).

"ready each resident . . . for life in the community at large . . ." *Id.,* § V(9). To these ends, defendants are required to "develop a full program of normalization and community placement with a full complement of community services . . .," *id.,* which services shall include "a full and suitable educational program" in the New York City schools where such placement is appropriate to a particular individual's educational needs. *Id.,* §§ F(1), (10); V(13).

Under the supervision of Commissioner Coughlin, defendants have placed approximately 1,000 Willowbrook residents in family homes and community residences since May 1976. For many of those individuals between ages five and twenty-one, arrangements have been made to attend special education programs in the public schools under the jurisdiction of the Board. Though these programs are of various types, several should be noted briefly: first, Trainable Mentally Retarded ("T.M.R.") classes for moderately retarded children who can profit from training in social and occupational skills; second, Track IV classes for lower functioning T.M.R. children who require training in the most basic skills, such as eating, dressing, and toileting; third, Adult Skills Training Centers ("A.S. T.C.") for T.M.R. students between the ages of 15 to 21 years who can benefit from additional training in skills necessary to live effectively in the community, such as home living and environment skills, food preparation, and light industrial workshop skills;

and fourth, Occupational Training Centers ("O.T.C.") for students between the ages of 16 and 21 years who have the capacity to travel independently and to benefit from a job oriented instructional program of which work experiences and eventual job placement in competitive industry are integral parts. Programs housed in the O.T.C. may provide departmentalized instruction whereby the students move from class to class during the day to receive specialized instruction or participate in various shop classes. In addition to these programs, some of the children who have multiple handicaps—for example, mental retardation and blindness or deafness—are assigned to special schools in which they receive more sophisticated services suitable to their additional needs. Placement in these programs and promotion or transfer from one to another are generally determined by consideration of a combination of factors, including a child's age, the existence of a higher placement opportunity, and, most important, the child's individual development in relation to his or her educational needs and skills as set forth in the applicable individualized educational program ("I.E.P.").[4] Any decision to transfer a handicapped child is subject to review by a Committee on the Handicapped ("C.O.H.") prior to implementation of the transfer where such review is requested by parents of the affected child.[5]

Defendants' efforts to integrate former Willowbrook residents into the public school system as mandated by the Consent Judg-

---

**4.** Federal law and regulations require as a condition of federal assistance for state special education programs that a local educational agency

> will establish, or revise . . . an individualized education program for each handicapped child at the beginning of each school year and will then review and, if appropriate revise, its provisions periodically, but not less than annually.

Education of the Handicapped Act, as amended by the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401, 1414(a)(5). Local school authorities are required to insure that, based on the applicable individualized educational program ("I.E.P."), each child's unique educational needs are met and that an

appropriate education is provided. 20 U.S.C. § 1401(18), 45 C.F.R. § 121a.346.

**5.** Section 4402.1.b of the New York State Education Law requires that the Board of Education establish a Committee on the Handicapped to review and evaluate placements of each handicapped child. According to counsel for the Board, there are approximately 32 such committees in New York City at the present time, each of which consists of four or five members, including at least a school psychologist, a teacher or administrator of special education, a school physician, and a parent of a handicapped child residing in the school district. Approximately 1,500 placement hearings are held monthly. *Tr.,* Nov. 14, 1978, at 113–17.

ment were dangerously imperiled when in early September 1978, on the eve of commencement of the Fall semester, the Board summarily excluded from their public school special education classes approximately 50 mentally retarded children—of whom 42 are members of the Willowbrook class—based upon identification of the children as carriers of hepatitis B. The procedural safeguard of pre-transfer C.O.H. review was suspended, and no arrangements were made for continuing the education of the excluded children elsewhere, though the Board's apparent intention was that further education could be provided indefinitely by returning the children to developmental centers under the jurisdiction of the O.M.R. D.D. On September 8, 1978, Commissioner Coughlin—in furtherance of his obligations to the Willowbrook class under the Consent Judgment—moved by order to show cause to enjoin the Board's action. After two days of hearings, this Court granted an injunction and held the total exclusion to be violative not only of the Consent Judgment, but also § 504 of the Rehabilitation Act of 1973, *supra*, the Education of the Handicapped Act, *supra*, the New York State Education Law, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. In so doing, we stated:

> For years the needs of these hepatitis B carrier children were satisfied without objection in special education classes. The needs are the same, but the children are now excluded for reasons which the hearing has shown to be unjustified and which are in direct opposition to the children's needs. The Board's overreaction to the hepatitis B problem is not countenanced by the law . . . .
>
> [W]e find that upon taking simple prophylactic and classroom management measures which it is in the Board of Education's power to take, there is no substantial risk of communication of hepatitis B from carrier pupils in the . . special education programs that justifies their discriminatory exclusion from the

benefits of a public school education, particularly in view of the unavoidable and irreparable harm such exclusion would work on the students involved.

*New York State Association for Retarded Children, Inc. v. Carey, et al.,* 466 F.Supp. at 486. Our decision at that time was limited solely to an adjudication of the issues presented by the facts then before the Court—*e. g.,* the Board's total exclusion of retarded carrier children—and we explicitly declined to consider the relative merits of less restrictive procedures which might have adopted by the Board. *Id.,* at 484.

*The Board's Proposed Plan*

Following issuance of the injunction by the Court and under pressure from parents of non-carrier children and fear of adverse publicity, the Board formed a task force—composed of representatives from the Board, the Willowbrook Review Panel, the New York City Department of Health, and plaintiffs—to devise and implement a plan consistent with Health Department guidelines recommending segregation within the public schools of hepatitis B carriers from non-carriers.[6] When after several meetings it became apparent that members of the task force could not agree on the necessity for separation of the carrier children, the Board of Education formulated on its own a plan designed to best meet the needs of all children consistent with the Department of Health recommendation of segregation, and it is this proposal which is now before the Court. According to Dr. Schonhaut, the plan is predicated on four essentials: (1) mandatory separation of carriers from non-carriers; (2) individualized consideration of each child's present educational placement and the proposed placement to assure the greatest possible degree of environmental similarity; (3) maximum reduction of movement so that a child will be placed at a new location only where relocation is unavoidable; and (4) maintenance of presently existing class sizes where possible.

---

**6.** These guidelines, which are the foundation for the Board's proposed plan, were issued in preliminary form in February 1978 and in final form six months later. Their substance is discussed in greater detail *infra* at 497–498.

Specifically, the Board proposes that 48 mentally retarded children thus far identified as hepatitis B carriers be reassigned to nine newly created special education classes, composed solely of mentally retarded hepatitis B carriers, in specified schools, one in each of the five boroughs. The plan provides for an individual evaluation of the personal and educational needs of each affected child to assure an appropriate educational setting,[7] and each child's parent or surrogate parent will be given an opportunity to have his or her child's placement reviewed by the appropriate C.O.H. prior to implementation of the reassignment. In some cases, the transfer will occur as part of a child's normal promotional sequence, although such promotion may have to be effected sooner and to a different class than would otherwise have been the case absent identification of the child involved as a hepatitis B carrier. Qualified teachers will be recruited, additional paraprofessional staff will be assigned to assist in the newly formed classes, and all mandated services which each child is currently receiving will be provided. Though class size will not initially reach the levels presently existing in the classes to which the children are now assigned, the Board contends that any detriment resulting from such a change will be offset by the higher staff-student ratio which the proposed plan would provide.[8]

The Board asserts further that 60 to 90 additional retarded carrier children are expected to enter the public school system in the near future, and it is anticipated that this influx will result in increasing class size and greater flexibility in placement. Provision is made in exceptional circumstances for placing carriers in classes with non-carriers, but the extent to which that exception will be utilized is not apparent. According to Dr. Schonhaut, the plan provides an appropriate educational opportunity for the carrier children consistent with the Department of Health's recommendation and the overriding obligation and purpose of the Board to protect the health and welfare of all retarded children, regardless of hepatitis B status, within the public school system.

*Adverse Effects of the Plan*

Other aspects of the reassignment plan suggest, however, that despite the Board's best efforts to assure an appropriate educational environment for the 48 carrier children, their interests will not be adequately protected. Briefly summarized, we find that some of the unavoidable consequences of the Board's proposal are the following:

(1) All of the children will be assigned to classes different from those they are now attending, and over half the children will be transferred to entirely different schools, resulting in disruption of each child's educa-

7. There is some question whether individual evaluations were actually made with respect to each of the 48 carrier children involved here. For example, Dr. Charles Schonhaut, Acting Executive Director of the Division of Special Education and Pupil Personnel Services, testified that a child's individual status was examined only in cases where the child was being reassigned to another location. No such evaluation was considered necessary with respect to children assigned only to a different room in the same school because it was assumed that "the children who are being kept in the same educational setting are being offered the same program, the same program being appropriate to start with." *Tr.*, Nov. 14, 1978, at 21. Dr. William Bitner, presently a member of the Willowbrook Review Panel and formerly Associate Commissioner of the New York State Education Department, and Ms. Kathy Schwaninger, Executive Director of the Willowbrook Review Panel, both testified that during their respective visits to classes in which many of the carriers

are presently placed, they were informed by teachers, staff, and even school principals with whom they spoke that inquiries by the Board had either not been made or, if made, were general in nature. We find it difficult to understand why more thorough inquiries were not made in view of the useful information which such persons could provide regarding the status and progress of the individual children.

8. Ms. Schwaninger disputed the importance in this case of the higher ratio of staff to students. While she admitted the potential benefit of individualized instruction to younger children between the ages of four and eight, she stated that for older children to whom socialization skills are increasingly important the benefits of larger classes cannot generally be compensated for in the manner suggested by the Board. The youngest of the 48 children here involved is ten or eleven years of age. *Tr.*, Nov. 20, 1978, at 128.

tional program and a disorientation the effect of which is likely to be far more serious than would be experienced by non-handicapped children.

(2) Class sizes will be reduced from a present range of six to eighteen students per class to a range of three to eight students per class, imposing a limitation on the opportunities which these children would otherwise have for peer interaction and exposure to children of non-institutionalized backgrounds and non-handicapped children. Such contact, as part of the education of handicapped children, is viewed increasingly as an essential precondition to realization of a child's capacity for emotional and social growth.[9]

(3) In order to obtain the minimum number of students necessary to form a new class, the plan requires the grouping or "cohorting" of students having differing developmental levels who would otherwise be placed in programs more closely tailored to their individual needs as prescribed in the applicable I.E.P. The Board's own witnesses admitted dissatisfaction with the unavoidable compromises which the proposed plan would require. Mr. Murray Beer, Program Coordinator of the Adult Skills Training Center and a participant in formulation of the proposed plan, stated in a letter to Acting Director of the Bureau for Children with Retarded Mental Development that:

> We are not happy with the way we had to compromise and cross-categorize students but all attempts to keep to age and handicap resulted in exorbitant number of classes, staff and sites. We, therefore, made the decision to establish classes of combined handicaps but separated according to ages.

Dr. Schonhaut testified at the hearing on November 14, 1978:

I think that some of the children would not have been moved if we had not followed the recommendation [of the Department of Health] . . . and we certainly would not have separated the children. In some cases they are in groupings of fewer children than they would have been before. And in those cases we would not have done it if it wasn't (sic). Separation is the recommendation we are following, and that separation resulted in certain changes which we would not have made if it were not for the Department of Health recommendation.[10]

Such cross-categorization will limit the use of instructional aids, techniques, and group activities which more homogeneously composed classes employ, and it may prove detrimental to the education of not only the less developed students but also those who are more advanced.

(4) All of the children presently placed in Track IV classes will be advanced to higher functioning T.M.R. classes despite serious question as to their present ability to benefit from such promotion. Similarly, several children who would normally be placed in schools with specialized services—i. e., the School for the Multiply Handicapped—will be assigned to special education classes in regular schools, again without certainty that they are adequately prepared for such an environment. These promotions are not mandated by the applicable I.E.P.[11]

(5) Students now provided non-academic and extra-curricular activities (such as meals, recess, dances, assemblies, and similar social events) with non-handicapped children or children in other special education programs will be permitted to engage in such activities only with other retarded

9. *See* discussion *infra* at 496–497.

10. *Tr.,* Nov. 14, 1978, at 23–24.

11. When questioned concerning the appropriateness of transferring Track IV children into T.M.R. classes, Mr. Sidney Miller, Supervisor for Track IV programs in New York City and participant in formulation of the proposed plan, expressed his uncertainty:

> I really don't know. I have really given this a lot of thought and anguish. I don't know. I am hoping, and I am going to watch it. And I feel the services are there, but to really say that about a program, I really love, and knowing that some of these children—I don't know, I really can't answer your question honestly.

*Tr.,* Nov. 14, 1978, at 138.

hepatitis B carrier children in their assigned classes, thus severely limiting the potential of these children to benefit from peer contact and from association with more highly developed children.

(6) Students now in departmentalized educational programs will be required to remain in the same classrooms all day, and those children now attending O.T.C. will have access to shops and other training facilities only when such facilities are not being utilized by classes of non-carrier children.

(7) New teachers, paraprofessionals, therapists, and other staff will be assigned to the new classes, but assignment will be made only on a voluntary basis.

(8) Movement to new surroundings, disturbance of programs and relationships between and among students, teachers, and other staff, and the potentially devastating impact of the stigma caused by isolating these children as hepatitis B carriers may traumatize them and impair the continuity of their learning process, resulting in some cases in actual regression in personal and educational development.[12]

(9) Segregation of hepatitis B carriers will hamper, if not undermine, employment and community placement efforts on behalf of mentally retarded individuals generally and these children specifically, thereby imposing for an indefinite future period an additional burden on persons who, by virtue of their handicap, are already overburdened.[13]

Several examples will suffice to illustrate the potential impairment of educational opportunities attendant to the Board's proposal. Ms. Kathy Schwaninger, Executive Director of the Willowbrook Review Panel, provided a case-by-case analysis, based upon examination of the applicable I.E.P.s. and interviews with teachers, of seven children who are to be reassigned to one class at P.S. 16 in Staten Island. A wide diversity in functional levels is indicated by the following comparison of the short-term objectives of these children, as specified in their I.E. P.'s: Cindy S. must learn to pronounce the phoneme "S"; Gerard S. is being taught to say his first name clearly; James D. is in a class which emphasizes non-verbal skills such as signing and verbalization activities, and his objective is to match a sequence card activity; Juan H. is currently in a class where the children are taught to sit still at their desks in preparation for later academic activities such as reading and writing, and his goal is to express a thought or idea

---

12. Kathy Schwaninger explained the effect the proposed reassignment could have on the children:

> [T]hey are . . . undoubtedly going to experience a disruption in what they have been taught to date. And specifically with the mentally retarded individuals, most typically and virtually always, when there is this kind of change in a person's life there is a learning regression.
>
> \* \* \* \* \* \*
>
> The child will lose some of the skills he presently has and he will have to be taught the skills again.

*Tr.*, Nov. 20, 1978, at 129–30. Murray Beer, one of the principal architects of the proposal, conceded the potential severity of the trauma which the children may experience:

> I now believe there is [stigma associated with being a hepatitis carrier].
>
> \* \* \* \* \* \*
>
> But what is the option we are given? According to the Board of Health, if they say separate, I agree, the stigma is going to be terrible.
>
> \* \* \* \* \* \*

> But we are not asked to make that decision. We were told to separate.

*Tr.*, Nov. 20, 1978, at 190. Beer stated further that even if proposed classes become larger with other mentally retarded carriers placed in public schools, the stigma will still exist. *Id.* at 194.

13. Dr. Jennifer Howse, Associate Commissioner for the State Office of Mental Retardation and Developmental Disabilities ("O.M.R.D.D.") for New York City and Long Island Group Services, testified with respect to the increased problems which stigmatization as a hepatitis B carrier would pose for community placement efforts. At present, O.M.R.D.D. refuses to contract with agencies which discriminate based on hepatitis B carrier status, but Dr. Howse expressed doubt that this policy could be continued if segregation is permitted within the public schools. Thus, implementation of the proposed plan would endanger not only future job placement efforts, but initial placement of mentally retarded carriers in the community as well.

in a sentence; Scott B. and Robert A. are in a class of twelve children in which a living environment is simulated and the children learn such skills as cooking, making beds, and punching a time clock, and their objectives are to develop intelligible oral communication and simple writing skills; and Herschel W. is learning to give self-information orally upon request. While the Board emphasizes certain similarities in the special instructional needs of these children, we believe that the apparent disparity in basic communication skills raises serious question of the extent to which each of these children will benefit from the proposed reassignment, and this disparity reflects negatively on the appropriateness of the placements.

William Bitner, Ph.D., is presently a member of the Willowbrook Review Panel and was formerly Associate Commissioner of the New York State Education Department. He expressed concern as to the advisability of transferring Sammy G. from the Center for the Multiply Handicapped to a regular school, as the Board's plan proposes. Sammy, who is legally blind, has been receiving braille instructions, and his teachers report that he has made good progress. According to Dr. Bitner, a transfer at this point to a new environment would not be in Sammy's best interest because of the difficulties he would encounter in acquainting himself with new surroundings and personnel. Though he is familiar with his present classroom setting, he would be required because of his sight disability to learn the dimensions and layout of his new location by touch. Dr. Bitner testified also regarding Chris H., a lower functioning child currently placed in a Track IV program in P.S. 76. He cannot identify colors or letters, has trouble holding a pen or crayon, experiences difficulty sitting down and remaining in his seat, and he wanders about the classroom continually. Though Dr. Bitner believes he would not benefit from a promotion at this time, under the proposed plan Chris would be promoted to a regular T.M.R. class in which the higher functioning students are able to read up to a third grade level.

The reduction in peer interaction resulting from smaller classes and enforced segregation is conceded by the Board, but several examples are illustrative. According to his I.E.P., Paul K.'s primary educational objective is to practice social interaction with his peers. Currently, he is in a class of fifteen students, but under the Board's proposal he would be transferred to a class in Manhattan of only three students. Debra G. and Annette C. presently benefit from use of such facilities as a home economics room and a boutique at their Queens school. If moved and segregated, these children may be foreclosed from their present participation in these activities. Similarly, students such as Salvatore L., Louis A., Lisa L., Robert S., and Angela K., who now receive departmentalized instruction concentrating on their most critical educational needs, would no longer be permitted to move from one class to another during the day, but would be confined to single classrooms and their associations limited solely to other hepatitis B carrier children. At an age when varied stimulation and broad interaction with other individuals are considered both desirable and necessary, this kind of restriction in the educational programs of the children seems a regressive, rather than progressive, alteration of existing placements.

Citation of further examples here would only be cumulative. We are convinced that under the Board's plan these children would not be placed in the "least restrictive environment" as required not only by the Consent Judgment but also by federal and state law and regulations.[14] The importance of socialization to the education and development of handicapped persons has been recognized also by other courts, including the Southern District of Western Virginia in *Hairston v. Drosick,* 423 F.Supp. 180, 183 (1976):

> A child's chance in this society is through the educational process. A major goal of the educational process is the socialization process that takes place in the regular

classroom, with the resulting capability to interact in a social way with one's peers. It is therefore imperative that every child receive an education with his or her peers insofar as it is at all possible. * * *

It is an educational fact that the maximum benefits to a child are received by placement in as normal environment as possible. The expert testimony established that placement of children in abnormal environments outside of peer situations imposes additional psychological and emotional handicaps upon children which, added to their existing handicaps causes them greater difficulties in future life. A child has to learn to interact in a social way with its peers and the denial of this opportunity during his minor years imposes added lifetime burdens upon a handicapped individual.

See also *Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295, 1323 (E.D.Pa.1977); *New York State Association for Retarded Children, Inc. v. Carey,* 466 F.Supp. at 485. Moreover, we find—and the Board conceded—that existing placements, previously determined to be appropriate to the individual needs of the children, will be altered under the plan for reasons other than furtherance of the students' educational development. Though the Board contends that the proposed reassignments are educationally appropriate, the evidence indicates that the potential for disruption, trauma, and disorientation are great, and, indeed, testimony of the Board's own witnesses confirms the "compromises" and the risks necessitated by the plan. Such testimony raises grave question as to the appropriateness of the placements. The relevant inquiry, therefore, is whether on balance the proposed segregation of carrier children, with its resultant educational disadvantages, is justified to protect the health and welfare of the non-carrier retarded children. Accordingly, we proceed to examine the basis upon which the Board determined that the proposed action is necessary.

*Potential Health Risk*

Commencing in April 1977, the New York City Health Department received inquiries expressing concern over the potential spread of hepatitis B within the public schools. In the Fall of that year, a Health Department team of two doctors under the direction of Dr. John Marr, Director and principal Epidemiologist for the Bureau of Preventable Diseases, was dispatched to P.S. 69 in Staten Island to investigate a report that a special education teacher had become infected with hepatitis. Though the doctors discovered that hepatitis A, not hepatitis B, was actually involved, their observations at the school and substantial parental concern led to a series of ten classroom visits during the course of which the doctors observed such unhygienic behaviors among students as slobbering, kissing, biting, mouthing of objects, and scratching. Based on these observations, they concluded that "there was significant possibility of transfer of hepatitis B within the classroom setting . . ." [15]

The Health Department then assembled a panel of six experts [16] in the study of hepatitis and hepatitis B to explore the possibility of spread of hepatitis B within the public schools. On December 20, 1977, this Advisory Committee met in New York to review the classroom observations of the two Department of Health doctors, and thereafter, in February 1978, tentative guidelines were issued. These guidelines recommended that, based on hepatitis B test results, the mentally retarded students identified as hepatitis B carriers and immunes be separated within the public schools from all

15. Testimony of Dr. Marr, *Tr.,* Nov. 29, 1978, at 44.

16. The panel included Dr. David McCollum, Yale University School of Medicine; Dr. Wolf Szmuness, Senior Investigator at the New York Blood Center; Dr. Robert Purcell, Head of Hepatitis Viruses Section, National Institute of Allergy and Infectious Disease; Dr. James May-nard, Director, Hepatitis Laboratories Division of the Center for Disease Control, Phoenix, Arizona; Dr. Saul Krugman, New York University Medical Center; and Dr. Donald Lyman, who was Director of the Bureau of Disease Control, New York State Department of Health.

other retarded students who might be susceptible to transmission of the virus. Extra-curricular activities such as lunch and recess were to be conducted separately, and, though no segregation was mandated on school-busses, supervision was to be maintained to minimize hazardous contact between carriers and susceptibles. The guidelines called also for instruction of teachers in the management and prophylaxis of carriers, good personal hygiene and cleansing of environmental surfaces, and handwashing facilities in each classroom. After allowing opportunity for comment by all interested parties to whom copies of the guidelines were sent, the Health Department issued a revised version of the guidelines on August 14, 1978, a copy of which was forwarded by Health Department Commissioner Imperato to then Chancellor of the Board of Education Anker. Based upon this recommendation, the Board, as related above, acted in September 1978 to exclude all retarded carriers from the public schools. After this action was enjoined, the Board then devised the segregation plan now before the Court.[17]

According to the testimony of Dr. Marr, the Health Department did not attempt by the guidelines to assess the risk of transmission of the virus within an integrated classroom setting. To make such an assessment, he stated, would have required a long-term epidemiological experiment due to the commonly subclinical nature of the disease and the multiplicity of factors necessary for its spread. Thus, the guidelines were directed only to prevention of a risk of transmission, which Dr. Marr characterized as "low," and they were not intended to determine either the magnitude of that risk or its causative factors. Indeed, Dr. Marr testified that upon a review of hepatitis B cases in New York City, "we were not able to determine any case that might be epidemiologically linked . . . with the classroom set-ting." [18] Emphasizing the difficulty of proving a causal relationship between the classroom setting and transmission of the disease because causality is "almost a philosophic concept," he stated that "we feel that those factors do exist that would promote the spread of the disease within the classroom . . ." [19]

Plaintiffs introduced evidence disputing the basis for the Health Department's conclusion that mentally retarded carriers should be segregated. Dr. Bitner visited three schools at which the affected children are currently attending classes, and, though specifically watching for the kinds of intimate contact cited by the Health Department doctors, he did not observe any such contact. Upon inquiry of teachers and staff, he was informed that unhygienic behaviors were not a particular problem, with the exception of one student whose past aggressive behavior was no longer evident. At least ten classrooms were visited by Ms. Schwaninger to observe the hepatitis B carriers. She confirmed Dr. Bitner's conclusions and characterized as "exceptional" the personal hygiene of the children observed by her. Specifically with regard to the retarded carrier children here involved, teachers with whom she spoke informed her that the so-called "problem behaviors" were not demonstrated; more generally, they assured her that, with regard to all special education children, such behaviors were not considered problematic and could be controlled. This corroborated her testimony at a prior hearing in which, based upon her own teaching experience and observation of 100 to 150 special education programs throughout the country, she expressed her belief that unhygienic behavior can be substantially reduced where classroom settings are properly structured and managed.

Dr. Cladd Elizabeth Stevens, an epidemiologist with the New York Blood Center

---

17. Dr. Schonhaut testified that after receipt of the guidelines, representatives of the Board requested that the Department of Health order the Board to exclude all retarded hepatitis B carriers from public schools. When the Health Department refused to do so, the Board undertook on its own to exclude the children. *Tr.,* Nov. 14, 1978, at 82–86.

18. *Tr.,* Nov. 29, 1978, at 17.

19. *Id.* at 71, 73.

and Visiting Clinical Associate Professor of Public Health at Cornell University, concurred with Dr. Marr's testimony that the risk of transmission of the virus in the classroom setting is small and depends upon a constellation of factors, including health of the non-carrier, type of contact, frequency of contact, and hygiene of both the carrier and the susceptible. Her testimony indicated, however, that whatever risk does exist is little more than theoretical in view of the fact that "there is no evidence at all as to the risk of hepatitis B infection among classroom contacts." [20] With respect to the Board's premise that mentally retarded persons pose a more significant risk of transmission of the virus, Dr. Stevens stated that "there is some evidence that non-institutionalized mentally retarded children have no greater prevalence of hepatitis B markers than normal children . . ." [21]

Both the Center for Disease Control of the United States Public Health Service and the New York State Department of Mental Hygiene (now O.M.R.D.D.) have considered the problem of control of hepatitis B. Neither agency recommends segregation of carriers, but each concludes that proper hygienic practices and adequate supervision are necessary to reduce any risk of transmission of the virus. As stated in the report of the Center for Disease Control entitled "Perspectives on the Control of Viral Hepatitis, Type B":

> Practical precautions are needed to reduce transmission of [hepatitis B] from [antigen-positive] mentally retarded residents to persons such as teachers, classmates, and parents who come in close personal contact. In general and until more definitive information on the infectiveness of persons with [hepatitis B] becomes available, it is important to avoid placing unwarranted limitations or restrictions on [antigen-positive] retarded persons.

United States Public Health Service, Center for Disease Control, *Morbidity and Mortality Weekly Report*, vol. 25, no. 17, at 7 [May 7, 1976].

Based on the foregoing, we dispute the Board's conclusion that the integration of hepatitis B carriers in special education classes within the public schools poses a significant health risk, and we believe that the Board may once again have overreacted in its efforts to prevent spread of the virus within its jurisdiction. The medical evidence upon which the proposal is based is sparse and fails to demonstrate any causal relationship between the classroom setting and transmission of the virus. The proposal, when considered in relation to the significance of the reassignment to the educational programs of the mentally retarded children affected, is decidedly unpersuasive. Though these children have in the past been institutionalized, the evidence is inconclusive that they exhibit within the classroom environment the maladaptive behaviors often associated with such experience. To be sure, we recognize the obligation and duty of both the Board and the Health Department to protect the health and welfare of the non-carrier retarded children. We consider highly significant, however, the inability of the Board to offer any evidence of even one instance of actual transmission of the virus within the classroom setting, despite the fact that many of these carrier children have been attending public schools for several years. The testimony of Dr. Jennifer Howse, Associate Commissioner of O.M.R.D.D. for New York City and Long Island Group Services, is significant also in this regard—that since 1975 approximately 130 hepatitis B carriers have been placed in community and family homes in which contact is likely to be at least as intimate as it is in the classroom—if not more so—and yet, not one instance of hepatitis B transmission has been reported.

In the enforcement of the Consent Judgment it is the duty of the Court to insure that the class members are educated in the least restrictive environment appropriate to their needs. Without requiring that the Board clearly demonstrate existence of a

---

**20.** *Id.* at 147.

**21.** *Id.* at 153.

significant health risk, we cannot countenance depriving these retarded children of the benefits to be gained by association with other children, handicapped and non-handicapped, nor can we permit any action which, by its stigmatizing consequences, would irreparably disrupt their educational development. In view of the availability of less drastic prophylactic measures which might be adopted consistent with the recommendations of both the United States Public Health Service and the O.M.R.D.D., the proposed segregation seems an unwarranted and unnecessarily restrictive reaction to the purely theoretical risk of transmission that the Board has shown. We now proceed to the principles of law relevant here.

## II. DISCUSSION

■ Before reaching the substantive merits of the Board's application, we believe it is appropriate to consider its contention that the decision to segregate retarded hepatitis B carriers within the public schools based upon the recommendation of the Department of Health carries with it presumptive validity and is controlling of the issues here involved. To hold otherwise, the Board argues, would render the Health Department's determination a nullity and would, in effect, require the Board to justify and defend a medical determination which is more properly within the purview of the Health Department. In support of this contention, the Board cites § 556 of the Administrative Code of the City of New York granting to the Health Department jurisdiction over health matters in New York City.[22]

Without determining the existence or effect of such a presumption, we find that the Health Department guidelines relied upon by the Board are not regulations in the traditional sense and are not entitled to the weight accorded to regulations. During the hearings, the guidelines were repeatedly characterized by attorneys and witnesses for the Board as "recommendation[s]," and the Board has not shown—nor apparently could it show—that the guidelines were promulgated in the manner made mandatory for regulations by § 1105 of the New York City Charter.[23] Though the Board contends that the recommendation to segregate was adopted pursuant to statutory authorization

---

**22.** Section 556 of the Administrative Code of the City of New York provides, in pertinent part, as follows:

Except as otherwise provided by law, the department [of health] shall have jurisdiction to regulate all matters affecting health in the city of New York and to perform all those functions and operations performed by the city that relate to the health of the people of the city, including but not limited to the following:

* * * * * *

(e) engage in or promote health research for the purpose of improving the quality of medical and health care; . . .

(f) supervise the reporting and control of communicable and chronic diseases and conditions hazardous to life and health; . . .

(h) promote or provide education in the prevention and control of disease . . .

**23.** Section 1105 of the New York City Charter states, in pertinent part, as follows:

§ 1105 . . . b. No rule or regulation of an officer of the city or of a city agency, nor an amendment or addition thereto, shall be adopted or repealed pursuant to any provision of this charter unless, prior thereto, there shall be afforded by such officer or

agency an opportunity for interested persons to comment in writing thereon by a date certain to be specified in a notice published at least twice in the City Record, the first publication being not less than twenty days and the second publication being not more than ten nor less than five days preceding the date so specified.

* * * * * *

c. In addition thereto, and on the occasion of the first publication in the City Record, for the purpose of broadly disseminating such information, a separate copy of such notice shall be transmitted to the council and mailed to each council member, the chairperson of all community boards and to civic organizations and the news media.

* * * * * *

f. No rule or regulation made by any officer of the city or by an agency nor any amendment, addition, or repeal of it shall be effective until (1) it is filed in the office of the city clerk, (2) a copy is transmitted to the council for its review, and (3) after such filing and transmittal, it is published in the City Record and thirty days have elapsed after such publication.

* * * * * *

as an official policy statement of the Health Department after study by eminent experts and opportunity for comment by selected individuals, this clearly does not satisfy § 1105.[24]

We find no precedent—and the Board cites none—for the proposition that an agency recommendation must be accorded weight equivalent to a validly promulgated regulation. On the contrary, where, as here, the Health Department recommendations were more akin to a general statement of policy than a mandatory prescription, the Board's decision to follow the recommendation must be deemed voluntary. Consequently, the Board must be prepared to defend its own action on the merits.[25] *Pacific Gas and Electric Co. v. Federal Power Commission*, 164 U.S.App.D.C. 371, 376–377, 506 F.2d 33, 38–39 (1974); *Engel v. Vitale*, 18 Misc.2d 659, 668, 191 N.Y.S.2d 453, *aff'd*, 10 N.Y.2d 174, 218 N.Y.S.2d 659, 176 N.E.2d 579 *rev'd on other grounds*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). While courts may properly accord less weight to agency guidelines or policy statements than to administrative regulations, *General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976), the weight to which they are entitled in a particular case "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift and Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124

(1944); *General Electric Co. v. Gilbert*, 429 U.S. at 142, 97 S.Ct. at 411.

In this case, the Health Department's recommendation did not carry with it the full panoply of trappings traditionally considered essential to insure the trustworthiness of a valid regulation. For example, no public hearings were held, no notices of proposed rulemaking were published, and only limited opportunity was provided for input by interested persons. Under these circumstances, it would be inappropriate to accord the guidelines the "presumptive validity" which the Board contends is necessary, particularly where the recommendations would have so adverse an impact on the children affected by them. Accordingly, we believe the Board's action must stand or fall on its own merits.[26]

*Applicable Statutes and Regulations*

■ We are now left with the obligation of determining the validity of the Board's proposed action under the relevant statutes. There is no question that the Board receives federal financial assistance for special education programs. For this reason, we must consider the validity of the proposed segregation under § 504 of the Rehabilitation Act of 1973, *supra*, and the Education of the Handicapped Act, *supra*. See 45 C.F.R. § 84.2. The former provides, in pertinent part, as follows:

> No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from participation in, be denied

24. *See* note 23 *supra*.

25. The Board can hardly dispute the discretionary nature of the guidelines in view of Dr. Schonhaut's admission that, though "the Department of Health's recommendation contained other items, . . . this [segregation] is the one item we are acting on." *Tr.*, Nov. 14, 1978, at 67. The Board's selective application of the guidelines is indistinguishable from discretionary action, and it must be considered as such.

26. The Board's citation of *National Labor Relations Board v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), and *Bayside Enterprises, Inc. v. National Labor Relations Board*, 429 U.S. 298, 97 S.Ct. 576, 50

L.Ed.2d 494 (1977), is inapposite. While the Board may be entitled to certain deference with regard to placement where such determination is made solely on the basis of educational considerations, testimony of the Board's own witnesses in this case indicated the appropriateness of existing placements and that reassignments were being made only because of the Board's fundamental policy decision to segregate mentally retarded hepatitis B carriers. Thus, the Board cannot validly claim the benefit of deference to its expertise, and it must bear the burden of justifying the proposed reassignments from admittedly appropriate existing placements because of an alleged health risk.

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

This provision, closely paralleling the language of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, embodies an explicit congressional purpose to prohibit discrimination against handicapped individuals in programs receiving federal financial assistance. 45 C.F.R. § 84.1. Comprehensive and detailed regulations interpreting the Act were issued by the Department of Health, Education, and Welfare in April 1977, 45 C.F.R. Part 84, effective June 3, 1977, and several of these are relevant here. We must determine in this case whether the segregation of mentally retarded carriers will constitute unlawful discrimination under the Act as defined in its regulations.

Section 84.4(b) of 45 C.F.R. sets forth discriminatory actions prohibited under the Act, and it states:

(1) A recipient, in providing any aid, benefit, or service, may not . . . on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others;

\* \* \* \* \* \*

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

\* \* \* \* \* \*

(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

Though we agree with the Board that the benefits are not required to produce the identical results or level of achievement for handicapped and non-handicapped persons, nevertheless the recipient "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the *most integrated setting appropriate to the person's needs.*" 45 C.F.R. § 84.4(b)(2) (emphasis added).

Sections 84.3(K) and 84.33(a) establish the obligation of the Board to provide to each qualified handicapped person a "free appropriate public education," which § 84.33(b) defines as

the provision of regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met . . .

Subsection (a) of § 84.34 permits the exclusion of a handicapped person from the regular school environment only if "it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." With regard to non-academic and extra-curricular activities such as meals, recess periods, health services, and recreational activities, subsection (b) of the same section requires that "a recipient shall ensure that handicapped persons participate with non-handicapped persons . . . to the maximum extent appropriate to the needs of the handicapped person in question."

We conclude that the segregation of retarded hepatitis B carriers without imposing a similar restriction on non-handicapped persons would constitute unlawful discrimination within the meaning of the Rehabilitation Act and § 84.4(b) of the regulations. Our factual finding *supra* that the proposed plan fails to insure that education of the 48 carrier children will be provided in the least restrictive environment also compels our conclusion that the plan, if effectuated, would violate the obligations of the Board (i) to educate the children in the most integrated setting appropriate to their needs (§ 84.4(b)(2) ), (ii) to provide an appropriate

education designed to meet the individual needs of the handicapped children to the same extent that those of non-handicapped children are met (§ 84.33(a)), and (iii) to ensure that the handicapped children participate with non-handicapped persons to the maximum extent appropriate to the needs of the carrier children affected (§ 84.34(b)). The Board's contention that the discrimination is necessary because certain unhygienic contacts between students in special education classes pose an increased risk of transmission of hepatitis B is unpersuasive for several reasons. First, the Board has not shown—nor did it attempt to determine in devising the proposed reassignments—that each of the 48 carriers actually engages in such contacts or that any other of the constellation of factors involved in the transmission of hepatitis B are more prominent in special education classes. Second, even assuming the existence of such maladaptive behaviors, we question the Board's unsupported conclusion that a substantially similar risk does not exist among non-handicapped children in public schools, particularly among those who have previously been institutionalized for any reason, because sharing of food and certain aggressive behaviors are not uncommon in regular public school classrooms. Again, it is significant that the Board is unable to demonstrate even one instance of transmission of the disease within the classroom setting. Finally, relevant federal and state guidelines, together with the testimony of Dr. Bitner and Ms. Schwaninger, indicate that careful attention to hygienic practices, proper classroom management and structure, and increased training of teachers and staff are sufficient to substantially reduce the risk of transmittal and obviate the claimed necessity for separation.

Thus, we find that the Board's showing of a purely theoretical risk of spread of hepatitis B predicated upon a philosophical concept of causation is insufficient to offset the weighty countervailing educational needs of the affected children. No substantial justification for the proposed discrimination has been demonstrated, which absence compels our conclusion that implementation of the Board's proposal would violate § 504 of the Rehabilitation Act of 1973. *Kampmeier v. Nyquist*, 553 F.2d 296, 299 (2d Cir. 1977); *Hairston v. Drosick, supra*; *Doe v. Marshall*, 459 F.Supp. 1190, 1191 (S.D.Tex.1978); *Davis v. Southeastern Community College*, 574 F.2d 1158, 1161 (4th Cir. 1978); *Sites v. McKenzie*, 423 F.Supp. 1190 (N.D.W.Va.1976); *Crawford v. University of North Carolina*, 440 F.Supp. 1047, 1059 (M.D.N.Ca.1977).

The foregoing analysis also leads to the further conclusion that the plan is violative of both the federal Education of the Handicapped Act, *supra*, and the New York Education Law, §§ 4401 *et seq.* The essential purpose of the federal statute is to provide states with funding for education of handicapped persons. 45 C.F.R. § 121a. Implementing regulations defining the conditions of such assistance became effective on October 1, 1977. State eligibility is made contingent upon the implementation of a detailed state plan of which the most important requirement is that a "free appropriate education" be offered by the public school district to all children within its geographic boundaries, 20 U.S.C. §§ 1401, 1412, 45 C.F.R. § 121a.1, in conformance with each child's I.E.P. 20 U.S.C. §§ 1401(18), 1414(a)(5), 45 C.F.R. § 121a.4. Similar requirements also exist under the New York Education Law § 4402.2.a and b(2).[27] Because the 48 carrier children have for several years been placed according to

27. New York Education Law § 4402.2.a states:
    The board of education or trustees of each school district shall be required to furnish suitable educational opportunities for handicapped children by one of the special services or programs listed in subdivision two of section forty-four hundred one. The need of the individual child shall determine which of such services shall be rendered.

Subsection b(2) of § 4402.2 states in part:
    The board shall select the most reasonable and appropriate special service or program for such [handicapped] children . . . upon receipt of the recommendation of the committee on the handicapped.
    \*　　\*　　\*　　\*　　\*　　\*

**504**

their educational needs as provided in their respective I.E.Ps. without segregation, we believe that the proposed transfer based on non-educational grounds deemed *supra* to be insufficient would be inappropriate and, thus, violative of their rights under the Education of the Handicapped Act and the New York Education Law. *See Stuart v. Nappi*, 443 F.Supp. 1235 (D.Conn.1978); *New York State Association for Retarded Children, Inc. v. Carey*, 466 F.Supp. at 486; *Kruse v. Campbell*, 431 F.Supp. 180 (E.D.Va.), *vacated and remanded*, 434 U.S. 808, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977).

*Fourteenth Amendment*

[7] In view of our findings under the statutes and regulations, we turn only briefly to one of the constitutional issues relevant to this application. Plaintiffs assert that the Board's segregation of only mentally retarded carriers of hepatitis B violates their rights to equal protection of the laws and that strict scrutiny analysis is appropriate because, *inter alia*, mentally retarded children are a suspect class. The definition of a suspect class for purposes of equal protection analysis was enunciated in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973), as:

> [a] class . . . saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. ·

*See also United States v. Carolene Products Co.*, 304 U.S. 144, 153 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). Courts have not consistently applied a single equal protection standard to handicapped individuals. In *Gurmankin v. Costanzo*, 411 F.Supp. 982, 992 n.8 (E.D.Pa.1976), *aff'd*, 556 F.2d 184 (3d Cir. 1977), the claim that blind persons constitute a suspect class was rejected on the ground that "[u]nlike distinctions based on race or religion, classifications based on blindness often can be justified by the different abilities of the blind and the sighted." On the other hand, in *Fialkowski v. Shapp*, 405 F.Supp. 946, 959 (E.D.Pa.1975), Judge Huyett suggested that the criteria set forth in *Rodriguez* for determining a suspect classification

> could certainly be read to include retarded children. Retarded children are precluded from the political process and have been neglected by state legislatures. Moreover, the label "retarded" might bear as great a stigma as any racial slur.

Accord: *Interest of G.H.*, 218 N.W.2d 441, 446–47 (Sup.Ct.N.D.1974).

While Judge Huyett's reasoning in *Fialkowski* is appealing, we believe it is unnecessary in the context of this case to adopt it. Even under traditional equal protection analysis the constitutionality of the Board's proposal cannot be sustained. Among the approximately 1,000,000 children in New York City's public school system, no other group is tested for hepatitis B, nor is any action planned to identify or take special precautions with respect to any hepatitis B carriers other than those who are retarded. Such discrimination is not justified by the evidence. Thus, we conclude that the plan—with the classification as presently provided—is without rational basis and that the application of its provisions would constitute patent discrimination in violation of the rights of the 48 carrier children to equal protection of the laws.[28]

## III. CONCLUSION

In sum, we find and hereby declare that the Board's proposed plan to segregate within the public schools all mentally retarded children epidemiologically classified as hepatitis B carriers is not in accord with

---

**28.** Plaintiffs and the United States Department of Justice, as *amicus curiae*, also attack the plan as violative of the rights of the carrier children under the Due Process clause. In its post-trial brief, the Justice Department cites three claimed fundamental rights which allegedly are infringed by the plan: (1) right to liberty; (2) right of association with other students in public education programs; and (3) right of free expression. Because we conclude that the plan is without rational basis, we need not consider these other claims.

applicable law and would violate their rights under (1) §§ A, F and V of the 1975 Willowbrook Consent Judgment; (2) § 504 of the Rehabilitation Act of 1973, *supra,* and applicable regulations promulgated thereunder; (3) the Education of the Handicapped Act, *supra,* and applicable regulations promulgated thereunder; (4) §§ 4401 *et seq.* of the New York Education Law; and (5) the Fourteenth Amendment to the Constitution.

It is hereby

ORDERED that a judgment be entered in accordance with the above declaration.