[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 6, 2005
THOMAS K. KAHN
CLERK

_____

No. 02-10360
_____

D. C. Docket No. 99-03513-CV-AJ

ASSOCIATION FOR DISABLED AMERICANS, INC.,
MICHELLE CALDERON,
STEVE BROTHER,
JORGE LUIS RODRIGUEZ,

Plaintiffs-Appellants,

UNITED STATES OF AMERICA,

Intervenor,

versus

FLORIDA INTERNATIONAL UNIVERSITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 6, 2005)**

Before BIRCH, KRAVITCH and GIBSON[*], Circuit Judges.

KRAVITCH, Circuit Judge:

The issue presented in this case is whether the Eleventh Amendment prevents a disabled person from suing a state university under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("Title II of the ADA").

## I. FACTS AND PROCEDURAL BACKGROUND

Plaintiffs-appellants, Association for Disabled Americans, Inc., Michelle Calderon, Steve Brother, and Jorge Rodriguez (collectively "appellants"), filed a complaint against defendant-appellee Florida International University (FIU),[1] alleging that FIU violated Title II of the ADA by, *inter alia*, failing to provide qualified sign language interpreters, failing to provide adequate auxiliary aids and services such as effective note takers, and failing to furnish appropriate aids to its students with disabilities such as physical access to certain programs and facilities at FIU. The complaint sought injunctive relief to prevent the discrimination. FIU alleged that the appellants' claim was barred by the Eleventh Amendment.

The district court granted FIU's motion to dismiss, finding that the Eleventh Amendment barred appellants' claims. The appellants appealed and the United

[*]Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[1]FIU is a public university funded by the State of Florida.

2

States intervened pursuant to 28 U.S.C. § 2403(a) to defend the constitutionality of the abrogation of Eleventh Amendment immunity in Title II of the ADA.

This appeal was stayed pending the Supreme Court's decision in *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), which concerned the constitutionality of Title II of the ADA as applied to cases implicating the right of access to the courts by disabled citizens. In light of *Lane*, we now turn to the question of whether the Eleventh Amendment bars appellants from suing FIU.

## II. DISCUSSION

### A. Standard of Review

The granting of a motion to dismiss based upon Eleventh Amendment Immunity is subject to *de novo* review. *Seminole Tribe of Florida v. Florida*, 11 F.3d 1016 (11th Cir. 1994), *aff'd* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *McDonald v. Hillsborough County School Bd.*, 821 F.2d 1563 (11th Cir. 1987).

### B. Eleventh Amendment Immunity as applied to a Public Education Institution

Title II of the ADA prescribes that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a *public entity*, or be subjected to discrimination by *any such entity*. 42 U.S.C. § 12132 (emphasis

3

added).

The Eleventh Amendment grants States immunity to suits brought by private citizens in federal court. U.S. Const. amend. XI. Congress can abrogate that immunity where (1) Congress "unequivocally expressed its intent to abrogate" the States' sovereign immunity in the statute at issue and (2) "Congress acted pursuant to a valid grant of constitutional authority." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 640, 145 L.Ed.2d. 522 (2000). Congress satisfied the first requirement by writing the following language into Section 12202 of the ADA: "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court . . . for a violation of" the ADA. 42 U.S.C. § 12202. This appeal, therefore, involves the second requirement, i.e. whether the statutory provision removing Eleventh Amendment immunity for private suits under Title II of the ADA is a valid exercise of Congress's authority under Section 5 of the Fourteenth Amendment.

"When Congress seeks to remedy or prevent unconstitutional discrimination, § 5 [of the Fourteenth Amendment] authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause." *Lane*, 124 S.Ct. at 1986. In *City of Boerne v. Flores*, 521 U.S. 507, 519-20, 117 S.Ct. 2157, 2164, 138 L.Ed.2d

4

624 (1997), the Supreme Court held that Section 5 legislation is valid if it exhibits "a *congruence and proportionality* between the injury to be prevented or remedied and the means adopted to that end." (Emphasis added).

In order to establish whether Congress's enactment of Title II of the ADA satisfies the *Boerne* "congruence and proportionality" requirements in the context of a public education institution, we follow a three-step analysis. *See Board of Trustees v. Garrett*, 531U.S. 356, 365-70, 121 S.Ct. 955, 963-66, 148 L.Ed.2d 866 (2001); *Boerne*, 521 U.S. at 519. Under this analysis, we must determine: (1) the constitutional right or rights that Congress sought to enforce when it enacted the ADA, (2) whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response to this history and pattern of unequal treatment. *Id.* We will discuss each step in turn.

(1) The Constitutional Right or Rights that Congress Sought to Enforce

In *Tennessee v. Lane*, the Supreme Court identified that Title II seeks to enforce the Fourteenth Amendment's "prohibition on irrational disability discrimination." 124 S.Ct. at 1998. Additionally, the Court noted that Title II seeks to enforce the constitutional guarantees under the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment in

5

the context of access to the courts. *Id.* The *Lane* Court concluded that these heightened rights are subject to "more searching judicial review." *Id.*[2]

Here, although classifications relating to education only involve rational basis review under the Equal Protection Clause, "[b]oth the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child," distinguishes public education from other rights subject to rational basis review. *Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2396-97, 72 L.Ed.2d 786 (1982). The Supreme Court long has recognized that even when discrimination in education does not abridge a fundamental right, the gravity of the harm is vast and far reaching. *See Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) ("education is perhaps the most important function of state and local governments" because "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education").[3] Thus, the constitutional right to equality in

---

[2]Although the rights at stake in *Lane* were fundamental, we note that the Court did not specify the need for a fundamental right to be at stake in order to satisfy this prong of the inquiry.

[3]*See also San Antonio Independent School Dist. v. Rodriguez*, 411 U.S.1, 29-30, 93 S.Ct.1278, 1295, 36 L.Ed.2d 16 (1973) ("the grave significance of education both to the individual and to society cannot be doubted"); *Wisconsin v. Yoder*, 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972) ("Providing public schools ranks at the very apex of the function of a State"); *Abington Sch. Dist. v. Schempp*, 374 U.S.203, 230, 83 S.Ct.1560, 1576, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring) ("Americans regard the public schools as a most vital civic institution for the preservation of a democratic system of government").

education, though not fundamental, is vital to the future success of our society.

(2) There was a History of Unconstitutional Discrimination

The *Lane* Court, in analyzing the second prong of the *Boerne* congruence and proportionality test, specifically noted that Congress "document[ed] a pattern of unequal treatment in the administration of a wide range of public services, programs and activities, including the penal system, *public education*, and voting." *Lane*, 124 S.Ct. at 1989 (emphasis added). Under its analysis of this prong, the Supreme Court considered the record supporting Title II *as a whole*, and conclusively held that Congress had documented a sufficient historical predicate of unconstitutional disability discrimination in the provision of public services to justify enactment of a prophylactic remedy pursuant to Congress's authority under Section 5 of the Fourteenth Amendment. *Id.* at 1992. Therefore, the Supreme Court ruled that the second *Boerne* inquiry was satisfied. *Id.*; *see also*, *Miller v. King*, 384 F.3d 1248, 1271 n.25 (11th Cir. 2004) ("the Supreme Court in *Lane* in effect has decided the step-two inquiry as to Title II, and we must follow the Supreme Court's lead."). Thus, the second *Boerne* inquiry is satisfied in this case.

(3) Title II is an Appropriate Response to This History and Pattern of Unequal Treatment

The Supreme Court in *Lane* held that Title II of the ADA, as applied specifically to cases implicating the fundamental right of access to the courts,

7

constitutes a valid exercise of Congress's enforcement power under the Fourteenth Amendment. 124 S.Ct. at 1992-93. In coming to this conclusion, the Court emphasized that the congruence and proportionality of the remedies in Title II should be judged on an individual or "as-applied" basis in light of the particular constitutional rights at stake in the relevant category of public services. *Id.* Therefore, we now turn to the question of whether Title II of the ADA, as applied to access to public education, constitutes a valid exercise of Congress's enforcement power under Section 5 of the Fourteenth Amendment. For the following reasons, we conclude that it does.

Like the discrimination at issue in *Lane*, the "unequal treatment of disabled persons in the administration of" education has a "long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination."[4] 124 S.Ct. at 1993. In response to this history, Congress chose a

---

[4]In footnote 12 of the *Lane* opinion, the Court cited the following examples of state sanctioned public school disability discrimination: *New York State Assn. for Retarded Children, Inc. v. Carey*, 466 F. Supp. 487, 504 (E.D.N.Y. 1979) (segregation of mentally retarded students with hepatitis B); *Mills v. Board of Ed. of District of Columbia*, 348 F. Supp. 866 (D.D.C. 1972) (exclusion of mentally retarded students from public school system); *Robertson v. Granite City Community Unit School District No. 9*, 684 F. Supp. 1002 (S.D.Ill. 1998) (elementary-school student with AIDS excluded from attending regular education classes or participating in extracurricular activities); *Thomas v. Atascadero Unified School District*, 662 F. Supp. 376 (C.D. Cal. 1986) (kindergarten student with AIDS excluded from class). *Lane*, 124 S.Ct. at 1990 n.12. Justice Souter, in concurrence, also pointed to another administrative action that was judicially approved where a child was excluded from public school "as a justified precaution against the very sight of a child with cerebral palsy, lest he 'produc[e] a depressing and nauseating effect' upon others." *State ex rel. Beattie v. Board of Ed. Antigo*, 169 Wis. 231, 232, 172 N.W. 153 (1919).

8

limited remedy. Title II only prohibits discrimination by reason of disability. 42 U.S.C. 12132. Therefore, States retain their discretion to exclude persons from programs, services, or benefits for any lawful reason unconnected with their disability.

In light of the long history of state discrimination against students with disabilities, Congress reasonably concluded that there was a substantial risk for future discrimination. Title II's prophylactic remedy acts to detect and prevent discrimination against disabled students that could otherwise go undiscovered and unremedied. By prohibiting insubstantial reasons for denying accommodation to the disabled, Title II prevents invidious discrimination and unconstitutional treatment in the actions of state officials exercising discretionary powers over disabled students. *See Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736, 123 S.Ct. 1972, 1982, 155 L.Ed.2d 953 (perceptions based on stereotypes "lead to subtle discrimination that may be difficult to detect on a case-by-case basis").

Furthermore, Title II requires only "reasonable modifications that would not fundamentally alter the nature of the service provided." *Lane*, 124 S.Ct. at 1993. For example, in its attempt to equalize physical access to public buildings, Congress imposed reasonable architectural standards for new construction and allowed for less costly measures for older facilities. See 28 C.F.R. § 35.151; 28

9

C.F.R. § 35.150(b)(1).[5]

Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services. The relief available under Title II of the ADA is congruent and proportional to the injury and the means adopted to remedy the injury.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of FIU's motion to dismiss based on Eleventh Amendment immunity and REMAND the case for further proceedings consistent with this opinion.

---

[5]Regulations pursuant to Title II of the ADA create an obligation for a public entity to make reasonable modifications to ensure accessibility to a service, program, or activity. 28 C.F.R. § 35.150(a). A public entity is excused from this obligation if the proposed action would fundamentally alter the "service, program or activity or [would result in] undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3).