**Stephanie DOHMEN, Plaintiff–Appellant/Cross–Appellee,**

v.

**IOWA DEPARTMENT FOR THE BLIND, Defendant–Appellee/Cross–Appellant.**

No. 09–1108.

Court of Appeals of Iowa.

Nov. 10, 2010.

Roy M. Irish of Patterson Law Firm, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Jeffrey S. Thompson, and Scott M. Galenbeck, Assistant Attorneys General, for appellee.

Heard by SACKETT, C.J., POTTERFIELD and TABOR, JJ.

SACKETT, C.J.

Plaintiff, Stephanie Dohmen, appeals from the jury verdict which found the defendant, the Iowa Department for the Blind, did not discriminate against her in violation of Iowa law, the Federal Rehabilitation Act, or the Americans with Disabilities Act. Dohmen asserts the court erred in refusing to give her requested instructions. The department cross-appeals claiming the court erred in denying its motion for summary judgment. It argues it was entitled to a judgment as a matter of law because Dohmen failed to seek administrative remedies before applying to the district court for judicial review and because it has sovereign immunity. We affirm.

**I. BACKGROUND AND PROCEEDINGS.** Dohmen is legally blind and sought training through the Iowa Department for the Blind. She was admitted into the Orientation and Adjustment to Blindness program. She participated in training from June of 2000 until March of 2001 but withdrew due to health concerns. During her absence Dohmen acquired a service dog. She sought to resume training in Braille and computer skills in the program in June of 2002. The director of the department, Allen Harris, told Dohmen that she was welcome in the program but could not participate with her guide dog. He offered alternative options to Dohmen, including individual instruction in her home with her dog, individual instruction at the department's headquarters, rather than the orientation center with her dog, or participating in another orientation program out of state at the department's expense that permits service dogs. Dohmen did not accept these alternatives and wanted to participate in the program at the orientation center with other students and with her guide dog.

After filing a complaint with the Iowa Civil Rights Commission and obtaining a right-to-sue letter, Dohmen filed a complaint in the federal district court. She later dismissed that complaint and filed the petition in an Iowa district court. Her petition alleged the department violated the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, 794a, the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12150, and the Iowa Civil Rights Act, Iowa Code §§ 216.9, 216C.11 (2003). The department moved for summary judgment. The mo-

tion was initially denied but later granted following a hearing on motions to reconsider. The district court determined the department was entitled to a judgment as a matter of law and the court did not have subject matter jurisdiction because Dohmen failed to exhaust her administrative remedies. Dohmen appealed and our court reversed and remanded the case in *Dohmen v. Iowa Department for the Blind,* No. 07–0211, 2008 WL 2513802 (Iowa Ct.App. June 25, 2008). We explained that the failure to exhaust administrative remedies does not deprive the court of subject matter jurisdiction, but defers the court's authority to consider a case until administrative remedies have been exhausted. We further explained a party can waive this limit on the court's authority by failing to raise the issue at the first opportunity. We concluded that the department had waived its challenge to the court's authority by not raising the issue until it filed its motion to reconsider. We reversed the court's ruling and remanded for further proceedings.

On October 14, 2008, the department filed a motion in the district court requesting it order Dohmen to recast her petition as a petition for judicial review. The district court granted the motion and Dohmen filed a new petition asserting the same violations as were claimed in the original petition on February 2, 2009. The department filed several motions to have the recast petition dismissed. It claimed, again, the court lacked subject matter jurisdiction because Dohmen had failed to seek administrative relief first. It argued since the recast petition was labeled as a petition for judicial review, Dohmen was admitting that she should have sought administrative relief initially and did not. It also claimed the court lacked subject matter jurisdiction because the department had sovereign immunity as a state agency. The district court denied the motions.

Trial was held from February 9 to February 18, 2009. Dohmen made several objections to the instructions. She requested the jury be instructed that (1) the department was obligated to modify its policies so as to not segregate or isolate Dohmen from the other blind students receiving the same services at the same time, (2) the department was required to modify its policies to accommodate a service animal and allow the user of the animal to participate in regular programs, including the Braille and computer training with other students and with her service dog, and (3) that the department was required to modify its policies to ensure that Dohmen would not be separated from her service dog while receiving the services from the department. The court denied the requests stating,

> I did not find in my research that they were supported either by case law or the facts of this case, and they will not be given. Either that, or in certain instances I thought they were too much of a comment on the evidence in this case. And they were rejected for that reason.

The jury returned a verdict after a very short time of deliberation, finding the department did not discriminate against Dohmen in violation of Iowa civil rights laws, the Federal Rehabilitation Act, or the Americans with Disabilities Act (ADA). Dohmen filed a motion for a new trial. She claimed, among other things, that the jury instructions did not accurately set forth the law. Following a hearing, the district court denied the motion finding the jury instruction errors claimed by Dohmen were "either not supported by the law or were not properly requested."

Dohmen appeals asserting the district court erred in refusing to submit requested instructions. The department cross-appeals contending the court erred in de-

nying its motion to dismiss on the grounds that Dohmen failed to exhaust administrative remedies and the department is shielded by sovereign immunity.

**II. SCOPE OF REVIEW.** Our review of the district court's ruling on a motion to dismiss is for correction of errors at law. *Nixon v. State,* 704 N.W.2d 643, 644 (Iowa 2005). The motion should only be granted if the petition " 'on its face shows no right of recovery under any state of facts.' " *Rees v. City of Shenandoah,* 682 N.W.2d 77, 79 (Iowa 2004) (quoting *Trobaugh v. Sondag,* 668 N.W.2d 577, 580 (Iowa 2003)).

We review a claim that the trial court should have given a requested instruction for an abuse of discretion. *Summy v. City of Des Moines,* 708 N.W.2d 333, 340 (Iowa 2006). A requested instruction must be given by the court if it "states a correct rule of law having application to the facts of the case and when the concept is not otherwise embodied in other instructions." *Id.* We view the evidence in a light most favorable to the party requesting the instruction. *Banks v. Beckwith,* 762 N.W.2d 149, 151 (Iowa 2009). We will only reverse if the jury instruction error resulted in prejudice. *Deboom v. Raining Rose, Inc.,* 772 N.W.2d 1, 5 (Iowa 2009). Prejudice occurs if the jury instructions contain a material misstatement of the law. *Anderson v. Webster City Cmty. Sch. Dist.,* 620 N.W.2d 263, 265 (Iowa 2000). In determining whether prejudicial error misled the jury, we consider the instructions in their entirety. *Id.; Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd.,* 606 N.W.2d 376, 379 (Iowa 2000).

**III. FAILURE TO SEEK ADMINISTRATIVE RELIEF.** We first address the department's cross-appeal that contends the court erred in denying its motion to dismiss. It asserts the district court was without subject matter jurisdiction because Dohmen failed to seek relief through administrative proceedings first. The department raised this issue in its motion for summary judgment, which this court considered on appeal in *Dohmen v. Iowa Department for the Blind,* No. 07–0211, 2008 WL 2513802 (Iowa Ct.App. June 25, 2008). We held that the department waived the challenge because it was not made at the first opportunity. We will not reconsider the same challenge now as it is barred by the law of the case doctrine. *See Bahl v. City of Asbury,* 725 N.W.2d 317, 321 (Iowa 2006) (stating that under this doctrine, an appellate decision becomes controlling on both the trial court and any further appeals in the same case and the same issues cannot be reheard, reconsidered, or relitigated); *United Fire & Cas. Co. v. Iowa Dist. Ct.,* 612 N.W.2d 101, 103 (Iowa 2000).

**IV. SOVEREIGN IMMUNITY.** The department has asserted throughout the proceedings that it is entitled to a dismissal because it has sovereign immunity as an arm of the state. The district court in the original proceeding denied the department's motion to dismiss on this ground, determining that the State was not protected from suit in state court under Eleventh Amendment sovereign immunity and that sovereign immunity does not exempt a state from suit when a person alleges a violation of a valid federal law. When the department raised the issue during the proceedings on remand, the district court rejected the claim again, finding it was not timely raised and stating, "the court is not convinced that the State and/or federal governments intended to protect themselves or their agencies, especially one which worked for the protection of the blind, from suit for discrimination of any kind." We find since the department has repeatedly raised the defense and obtained

rulings on the issue, the question is preserved for our consideration.

The department concedes it is not immune from suit in state court under the Iowa civil rights laws because the chapter applies to government units that offer services, facilities, and benefits to the public. *See* Iowa Code § 216.2(12). It argues a state retains immunity from suit in state court under the Rehabilitation Act and the ADA. Dohmen argues the department has consented to suit because in response to a request for admissions, the department admitted that its programs are provided in compliance with the ADA and Rehabilitation Act.

■■■■■ **A. Consent and Waiver.** A state generally retains its sovereign immunity unless it consents to being sued or if Congress validly abrogates immunity through legislation. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55, 116 S.Ct. 1114, 1122–23, 134 L.Ed.2d 252, 265–66 (1996). The state must make an unequivocal expression of its intent to consent to suit or waive its sovereign immunity; a waiver will not be implied. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 680–82, 119 S.Ct. 2219, 2229, 144 L.Ed.2d 605, 621–22 (1999). We disagree with Dohmen's assertion that the department's admission to complying with applicable law operates as consent to waive the defense of sovereign immunity. *See id.* at 680, 119 S.Ct. at 2228, 144 L.Ed.2d at 619 (stating "[t]here is little reason to assume actual consent

based upon the State's mere presence in a field subject to congressional regulation"). Since we find the state has not consented to suit under either the Rehabilitation Act or the ADA, we now turn to the issue of whether Congress has abrogated sovereign immunity under either act.

■■■■■ **B. Statutory Abrogation in the Rehabilitation Act.** The Eleventh Amendment by its terms prohibits suits against States in *federal* court by out-of-state residents. U.S. Const. amend. XI.[1] It has been interpreted to also bar suits in *federal* court against a State by its own residents. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 962, 148 L.Ed.2d 866, 876–77 (2001). States enjoy protection from suit in *state court* as a part of the sovereign immunity they retain under the Tenth Amendment and inherent in the system of federalism established by the Constitution.[2] *Alden v. Maine*, 527 U.S. 706, 713, 730, 119 S.Ct. 2240, 2246–47, 2255, 144 L.Ed.2d 636, 652–53, 663 (1999); *Raper v. State*, 688 N.W.2d 29, 53 (Iowa 2004). To determine whether Congress has validly abrogated a state's immunity, we first ask whether Congress unequivocally expressed its intent to do so. *Tennessee v. Lane*, 541 U.S. 509, 517, 124 S.Ct. 1978, 1985, 158 L.Ed.2d 820, 833 (2004).

■■■■■ The Rehabilitation Act requires a state to waive its sovereign immunity as to suits in *federal court. See* 42 U.S.C. § 2000d–7(a)(1).[3] We have found

1. The Eleventh Amendment to the United States Constitution states,

 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

2. The Tenth Amendment states,

 The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

3. This section provides:

 A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in *Federal court* for a violation of section 504 of the Rehabil-

no cases where this section has been interpreted to also waive a state's immunity in *state* court. The cases we have found held otherwise. *See Purvis v. Williams*, 276 Kan. 182, 73 P.3d 740, 750 (Kan.2003) (finding 42 U.S.C. § 2000d–7 did not "reflect an unequivocal expression of Congress'[s] intent to waive a state's sovereign immunity against Rehabilitation Act claims brought for money damages in state court" and noting that if Congress intended to subject states to suit in state court it could have added this language to the statute); *Jackson v. State*, 544 A.2d 291, 298 (Me. 1988) ("[W]e conclude that the State may constitutionally interpose its sovereign immunity in state court as a bar to an award of damages under section 504 of the Rehabilitation Act."); *see also Lane v. Pena*, 518 U.S. 187, 200, 116 S.Ct. 2092, 2100, 135 L.Ed.2d 486, 497–98 (1996) (finding federal government did not waive its sovereign immunity for Rehabilitation Act claims because 42 U.S.C. § 2000d–7 only subjects *states* to suit in federal court, and did not expressly waive immunity for the federal government). We conclude Congress did not expressly intend to abrogate a state's sovereign immunity defense for Rehabilitation Act claims made in state court.

But this does not necessarily mean the district court's refusal to dismiss on this ground must be reversed. The Rehabilitation Act and the ADA generally provide the same substantive protections against discrimination based on disability. *See Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir.1996). Even if the department

was protected by sovereign immunity under the Rehabilitation Act, Dohmen's claims could properly proceed if the department was not immune in state court under the ADA. We now turn to this issue.

**C. Statutory Abrogation in the ADA.**
The ADA provides that no state shall be immune from an action in federal or *state* court for violations of the act. 42 U.S.C. § 12202. Even though this is an unequivocal expression of Congress's intent to repeal a state's sovereign immunity in state court, we must further consider whether Congress acted within its constitutional authority to abrogate immunity. *See Lane*, 541 U.S. at 518, 124 S.Ct. at 1985, 158 L.Ed.2d at 833.

▬▬▬▬ Congress cannot "abrogate a state's sovereign immunity preserved by the Tenth Amendment through Article I legislation. . . ." *Raper*, 688 N.W.2d at 53 (citing *Alden*, 527 U.S. at 712, 119 S.Ct. at 2246, 144 L.Ed.2d at 652); *Anthony v. State*, 632 N.W.2d 897, 900 (Iowa 2001). There are some limits to this general rule. "In exercising its Article I powers Congress may subject the States to private suits in their own courts . . . if there is 'compelling evidence' that the States were required to surrender this power to Congress pursuant to the constitutional design." *Alden*, 527 U.S. at 730–31, 119 S.Ct. at 2255, 144 L.Ed.2d at 663. Also, when Congress enacts valid legislation to enforce the Fourteenth Amendment,[4] it may authorize private suits against the states. *Id.* at 756, 119 S.Ct. at 2267, 144

---

itation Act of 1973 . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.
42 U.S.C. § 2000d–7(a)(1) (emphasis supplied).

4. The Fourteenth Amendment prohibits the State from depriving "any person of life, liberty, or property, without due process of law,

[or] equal protection of the laws." U.S. Const. amend. XIV, § 1. Congress was given the power to make appropriate legislation needed to enforce the rights guaranteed in the Fourteenth Amendment. U.S. Const. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.").

L.Ed.2d at 679. In enacting the ADA, Congress sought to invoke this power. 42 U.S.C. § 12101(b)(4).[5] The enforcement power of section five of the Fourteenth Amendment includes the authority to make laws that remedy and deter actual constitutional violations, and in addition, laws that "prohibit [ ] a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Garrett,* 531 U.S. at 365, 121 S.Ct. at 963, 148 L.Ed.2d at 878.

 Courts have looked to the actual conduct complained of in determining whether the ADA validly abrogates state sovereign immunity. If the alleged conduct is itself an actual violation of the Fourteenth Amendment, and a party seeks relief through Title II of the ADA, Congress's abrogation of state sovereign immunity is valid. *United States v. Georgia,* 546 U.S. 151, 159, 126 S.Ct. 877, 882, 163 L.Ed.2d 650, 659 (2006). If the conduct is in violation of Title II of the ADA, but not also a deprivation of a constitutional right, we must make a deeper inquiry into whether Congress's abrogation is valid. *See id.,* 126 S.Ct. at 882, 163 L.Ed.2d at 660. The process consists of three steps: (1) identify the scope of the right at issue and thus the level of scrutiny to apply, (2) examine whether Congress identified a history and pattern of unconstitutional discrimination by the states against the disabled in the provision of public services, and (3) evaluate whether the remedy imposed by the legislation is congruent and proportional to the constitutional rights the law seeks to enforce and the record of constitutional violations. *See Garrett,* 531 U.S. at 365–72, 121 S.Ct. at 963–66, 148

L.Ed.2d at 877–82. In our analysis, we may look to cases evaluating sovereign immunity in both federal and state courts. *See Alden,* 527 U.S. at 733, 119 S.Ct. at 2256, 144 L.Ed.2d at 665 (noting that the logic of the decisions, even if suit in federal court was at issue, extends to cases involving sovereign immunity in state courts). Iowa courts have not previously addressed whether state entities are immune from suits in state court under Title II of the ADA. And, our courts have not analyzed whether Congress validly abrogated state immunity for this specific type of ADA violation: denying the use of a service animal in an educational program for the blind. We therefore must apply the three-part test.

 *1. Constitutional Right at Issue.* The first step requires us to carefully identify the right at issue to determine the level of scrutiny to apply. *Garrett,* 531 U.S. at 365, 121 S.Ct. at 963, 148 L.Ed.2d at 878. Title II of the ADA prohibits public entities from discriminating against disabled persons in the provision of public services, programs, and activities. *See* 42 U.S.C. § 12132; *Lane,* 541 U.S. at 517, 124 S.Ct. at 1984, 158 L.Ed.2d at 833. In *Lane,* 541 U.S. at 522, 124 S.Ct. at 1988, 158 L.Ed.2d at 836, the United States Supreme Court considered whether Title II of the ADA was a valid abrogation of state sovereign immunity. The plaintiff in *Lane* alleged the state violated the ADA by not providing reasonable access to courthouses for disabled persons. *Lane,* 541 U.S. at 513, 124 S.Ct. at 1982, 158 L.Ed.2d at 830–31. The court applied the three-part test and concluded that the abrogation of state immunity was a valid use

---

**5.** This section provides,

 It is the purpose of this chapter ... to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate com-

merce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b)(4).

of Congress's section five authority under the Fourteenth Amendment to prevent and deter unconstitutional discrimination against disabled persons. *Id.* at 533–34, 124 S.Ct. at 1994, 158 L.Ed.2d at 841–42. It noted that classifications based on disability were only subject to rational basis review; nonetheless the claim implicated the constitutional guarantee of access to the court system. *Id.* at 522–23, 124 S.Ct. at 1988, 158 L.Ed.2d at 836–37.

 The right at issue is Dohmen's right to be free from discrimination "by reason of" her disability.[6] Disability is not a suspect classification. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 3257–58, 87 L.Ed.2d 313, 324 (1985); *Bowers v. Nat'l Coll. Athletic Ass'n,* 475 F.3d 524, 553 (3rd Cir.2007). There is also no fundamental right to public education. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35, 93 S.Ct. 1278, 1297–98, 36 L.Ed.2d 16, 44 (1973). It naturally follows there would be no fundamental right to a specialized public education with curriculum designed for blind persons.

However, in *Lane,* the court appeared to take a broad view of the right at issue, characterizing one's inability to access the upper floors of a courthouse as the potential denial of a fundamental right, access to the court system as a whole. *See Lane,* 541 U.S. at 522–23, 124 S.Ct. at 1988, 158 L.Ed.2d at 836–37. It concluded that Title II of the ADA "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review." *Id.* We do not believe this language means all Title II ADA claims will necessarily implicate constitutional rights and require "a more searching judicial review." But, in addressing Title II ADA claims involving discrimination in an educational setting, courts have followed *Lane*'s lead by framing the right at issue broadly and noting how education is tied to the exercise of fundamental rights. *See Doe v. Bd. of Regents of the Univ. of Neb.,* 280 Neb. 492, 788 N.W.2d 264, 287 (Neb.2010);[7] *Toledo v. Sanchez,* 454 F.3d 24, 36 (1st Cir.2006) ("The Supreme Court has recognized the vital importance of all levels of public education in preparing students for work and

**6.** It makes no difference that Dohmen is claiming she was treated differently than other disabled individuals. Under the ADA she has a right to not be discriminated against based on her disability whether the differing treatment is vis-a-vis non-disabled persons or other disabled persons. *See Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 598, 119 S.Ct. 2176, 2186, 144 L.Ed.2d 540, 556–57 (1999) (stating that the plaintiff did not need to identify a similarly situated class of persons receiving preferential treatment for the ADA to apply because Congress intended more comprehensive coverage of discrimination under the act). The *Olmstead* court compared the ADA to other civil rights acts, including those prohibiting age and sex discrimination. *Id.* at 598 n. 10, 119 S.Ct. at 2186 n. 10, 144 L.Ed.2d at 557 n. 10 (explaining that under the Age Discrimination in Employment Act, the protected class is limited to those forty and older but "[t]he fact that one person in

the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age").

**7.** In *Doe,* the Nebraska Supreme Court determined *Lane* was intended to apply broadly. It reasoned that after the *Lane* decision, the United States Supreme Court vacated and remanded a number of circuit court cases calling for further consideration of each claim in light of *Lane. Doe,* 788 N.W.2d at 287. It pointed out that one remanded case concerned a student's ADA Title II claim against a public university. *Id.* (citing *Parr v. Middle Tenn. State Univ.,* 541 U.S. 1059, 1059, 124 S.Ct. 2386, 2386–87, 158 L.Ed.2d 960, 960 (2004)). The *Doe* court viewed this as a signal that abrogation of state immunity may be valid even if the alleged violation does not directly infringe on a fundamental right. *Id.*

citizenship as well as the unique harm that occurs when some students are denied that opportunity."); *Ass'n for Disabled Americans v. Fla. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir.2005).[8] These courts stressed that education plays an important role in voting and participating in public services in general. *Doe*, 788 N.W.2d at 289; *see Toledo*, 454 F.3d at 33; *Ass'n for Disabled Americans*, 405 F.3d at 957–59. Given this trend, we feel compelled to apply this prong in an expansive sense estimating that Congress may have enacted the ADA's provisions prohibiting discrimination in education as an indirect measure to protect fundamental rights.[9]

*Lane* instructs,

> Whether Title II validly enforces ... constitutional rights is a question that "must be judged with reference to the historical experience which it reflects." While § 5 authorizes Congress to enact reasonably prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent. "Difficult and intractable problems often require powerful remedies," but it is also true that "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one."

*Lane*, 541 U.S. at 523–24, 124 S.Ct. at 1988–89, 158 L.Ed.2d at 837 (citations omitted). We therefore turn to the second part of the test: analysis of whether there is a pattern of discrimination justifying Congress's use of its remedial authority under section five of the Fourteenth Amendment.

**2. History of Unconstitutional Discrimination.** In *Lane*, the court also applied this part of the analysis comprehensively. The court evaluated the history of discrimination in accessing all types of public services that Title II sought to address, rather than limiting its review to only discrimination in access to courthouses or the justice system. *See id.* at 524–29, 124 S.Ct. at 1989–92, 158 L.Ed.2d at 837–41; *Bd. of Regents of Univ. of Neb.*, 788 N.W.2d at 288. It found "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systemic deprivations of fundamental rights." *Lane*, 541 U.S. at 524, 124 S.Ct. at 1989, 158 L.Ed.2d at 837. it stated that along with judicial findings of unconstitutional discrimination, there was "statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services ...." *Id.* at 529, 124 S.Ct. at 1992, 158 L.Ed.2d at 841.

There is a well-documented history of discrimination against disabled students

---

**8.** The Eleventh Circuit stated,

[A]lthough classifications relating to education only involve rational basis review under the Equal Protection Clause, "[b]oth the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child," distinguishes public education from other rights subject to rational basis review. *Ass'n for Disabled Americans, Inc.*, 405 F.3d at 957 (citation omitted).

**9.** Even though Dohmen is not claiming she has been deprived of a constitutional right, we must determine whether it may nonetheless be a valid abrogation of state immunity, since Congress can use its powers under section five of the Fourteenth Amendment to prohibit even constitutional conduct in an attempt to deter unconstitutional discrimination. *See Garrett*, 531 U.S. at 365, 121 S.Ct. at 963, 148 L.Ed.2d at 878; *see also Georgia*, 546 U.S. at 159, 126 S.Ct. at 882, 163 L.Ed.2d at 660 (remanding for district court to evaluate whether allegations were a constitutional violation, and if the misconduct was a violation of Title II but not the Constitution, ordering the court to still determine whether the abrogation was valid for that class of cases).

specifically in public education. *See Toledo*, 454 F.3d at 37–39 (discussing the historical case law and statutes that deprived disabled students of their rights to due process and equal protection by denying them educational opportunities, and thirty years of studies showing an ongoing problem of depriving disabled students access to educational opportunities). The *Lane* opinion cited numerous examples of discrimination of disabled students in education. *Lane*, 541 U.S. at 525 n. 12, 124 S.Ct. at 1989 n. 12, 158 L.Ed.2d at 838 n. 12.[10] Congress included a specific finding of pervasive discrimination in education within the ADA's text: " '[D]iscrimination against individuals with disabilities persists in such critical areas as ... *education* ....' " *Id.* at 529, 124 S.Ct. at 1992, 158 L.Ed.2d at 841 (quoting 42 U.S.C. § 12101(a)(3) (emphasis supplied)).

In light of this history and specific finding by Congress, we conclude Congress did identify a widespread pattern of states' unconstitutional discrimination against disabled students within educational programs.

**3. Congruent and Proportional.** The final step requires us to determine if there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Garrett*, 531 U.S. at 365, 121 S.Ct. at 963, 148 L.Ed.2d at 878; *City of Boerne v. Flores*, 521 U.S. 507, 520, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624, 638 (1997). In applying this prong of the test, the *Lane* court refused "to consider Title II, with its

wide variety of applications, as an undifferentiated whole." *Lane*, 541 U.S. at 530, 124 S.Ct. at 1992, 158 L.Ed.2d at 841. Instead, it limited its analysis to the specific question at hand: "[W]hether Congress had the power under § 5 to enforce the constitutional right of access to the courts." *Id.* at 531, 124 S.Ct. at 1993, 158 L.Ed.2d at 842. It concluded that requiring states to make reasonable accommodations to provide access to the courts for the disabled met the congruent and proportional requirement, and therefore the abrogation of state immunity was valid. *Id.* at 533–34, 124 S.Ct. at 1994, 158 L.Ed.2d at 843–44.

We must determine whether the ADA's remedies are a "congruent and proportional response to th[e] demonstrated history and pattern of unconstitutional disability discrimination." *Constantine v. The Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487–88 (4th Cir.2005). The ADA is designed to provide disabled persons "access to education" and prohibit exclusion of individuals with disabilities from participating in public education on the basis of their disability. 42 U.S.C. § 12132; *Bowers*, 475 F.3d at 555; *Constantine*, 411 F.3d at 488. It also mandates that public education programs make "reasonable" changes in policies, practices, and procedures to avoid discriminatory treatment of disabled persons. *See* 42 U.S.C. § 12131(2); 28 C.F.R. § 35.130(b)(7); *Constantine*, 411 F.3d at 488.

---

**10.** Examples cited by *Lane* include, *New York State Ass'n for Retarded Children, Inc. v. Carey*, 466 F.Supp. 487, 504 (E.D.N.Y.1979) (documenting segregation of mentally disabled students with hepatitis B); *Mills v. Bd. of Educ.*, 348 F.Supp. 866 (D.D.C.1972) (explaining the systemic exclusion of mentally disabled students from the public school system); *Robertson v. Granite City Cmty. Unit*

*Sch. Dist. No. 9*, 684 F.Supp. 1002 (S.D.Ill. 1988) (addressing a claim by an elementary-school student with AIDS who was excluded from attending regular education classes or participating in extracurricular activities); *Thomas v. Atascadero Unified Sch. Dist.*, 662 F.Supp. 376 (C.D.Cal.1986) (addressing a claim of a kindergarten student with AIDS excluded from class).

■ The ADA is designed to make public services accessible to disabled persons; but, the act includes limitations showing it is proportional and congruent to the targeted harm. A public entity must make only "reasonable" modifications and retains the ability to refuse to make modifications when it would be a "fundamental alteration" of the program or service. *Bd. of Regents of Univ. of Neb.*, 788 N.W.2d at 289. In addition, the protections under the ADA are limited to those "qualified individuals with a disability." 42 U.S.C. § 12131(2). We conclude that the limited remedies available under the ADA are congruent and proportional to Congress's goal of preventing unconstitutional discrimination against disabled individuals in public education. *See Bowers*, 475 F.3d at 555–56; *Toledo*, 454 F.3d at 40; *Constantine*, 411 F.3d at 490; *Ass'n for Disabled Americans, Inc.*, 405 F.3d at 959. Accordingly, Congress acted within its section five authority in abrogating state sovereign immunity for claims under Title II of the ADA.

■ **V. JURY INSTRUCTIONS.**
Dohmen argues the court erred by not giving her requested instructions, that certain instructions given were likely to confuse the jury, and overall the instructions were vague and ambiguous. The department claims Dohmen has not preserved error on any of these claims. We find Dohmen's objections prior to the submission of the case to the jury and her motion for a new trial did preserve her claims concerning her requested instructions. Dohmen did not object in the district court to the instructions being confusing, vague, and ambiguous. Error was not preserved on this claim, and we do not address it. *See Midwest Home Distrib., Inc. v. Domco*

*Indus., Ltd.*, 585 N.W.2d 735, 744 (Iowa 1998).

■ **A. Instructions on Segregation.**
Dohmen first argues the court erred in not giving her requested instruction on segregation under the ADA and section 504 of the Federal Rehabilitation Act. The requested instruction was:

It is the intention of the ADA and sec. 504 to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by others. Integration is fundamental to the purposes of the ADA and sec. 504.

The court denied the request but did give this instruction:

The Federal Rehabilitation Act prohibits an otherwise qualified individual with a disability from being excluded from participating in or being discriminated against under any program or activity receiving federal assistance solely on the basis of her disability.

Dohmen also requested the marshaling instructions state that she was claiming the department violated the ADA and section 504 of the Federal Rehabilitation Act by "denying the Plaintiff the equal opportunities enjoyed by others who receive training in Braille and computer usage with her dog present, by excluding and segregating her in order to receive those services." The marshaling instructions given by the district court stated that for Dohmen to establish her claims, she had to prove that she "was excluded from participating in the Adult Orientation and Adjustment Center solely due to her disability."

Dohmen argues that the instructions as submitted did not fully explain that unjustified segregation of persons with disabilities is discrimination under the applicable law. She cites *Helen v. DiDario*, 46 F.3d 325, 330–333 (3rd Cir.1995),[11] for support.

---

**11.** In *Helen,* the Pennsylvania Department of Public Welfare operated an in-patient nursing

We find *Helen* unhelpful on the issue of whether Dohmen was entitled to her requested jury instructions. *Helen* was an appeal from a summary judgment ruling against the plaintiff where the district court found the plaintiff, as a matter of law, was not discriminated against based on her disability. *See Helen,* 46 F.3d at 328–29. The Third Circuit reversed this determination on appeal but did not address any claim of jury instruction error. *See id.* at 330–33. It determined from the ADA regulations that unintentional segregation of the plaintiff was discrimination under the act. *See id.* at 335.[12] It was also able to determine as a matter of law that the plaintiffs specific segregation was discrimination under the ADA because the parties stipulated that plaintiff was eligible for the program she requested, and if there was a spot available, her retention in the less independent program would be inappropriate. *Id.* at 334. Finally, the court was able to conclude as a matter of

law that accommodating the plaintiff into the requested program would not require a fundamental alteration because the plaintiff was not asking for a substantive change to the program and she was only excluded due to administrative inconvenience. *See id.* at 337–38.

We agree with Dohmen that her requested instruction on the intent behind the ADA and Federal Rehabilitation Act is a correct statement of the law under *Helen* and the ADA. *See Id.* at 332–33; 28 C.F.R. § 35.130. But Dohmen fails to point out how the instructions given were incorrect statements of the law or failed to incorporate the concept she urged. She argues, "[t]he [c]ourt failed to incorporate in any way an instruction regarding the [department's] offer to provide services in a segregated setting outside of its regular program." We disagree. Instruction 10 incorporates the law on segregating disabled persons:

home program and an attendant care program where services were provided to a client in his or her own home. 46 F.3d at 327. Meningitis caused the plaintiff to be paralyzed from the waist down. *Id.* at 328. Although the plaintiff was not able to live completely independently, she did not need the full custodial care of a nursing home. *Id* Though the plaintiff was eligible for the attendant care program, she was placed in the in-patient nursing home program because there were no openings and a lack of funding for the attendant care program. *Id.* at 329. The plaintiff claimed that since she qualified for the attendant care program, the department's failure to provide the services in the "most integrated setting appropriate" to her needs absent an adequate justification, violated the ADA. *Id.* at 338. The court agreed that the department was obligated to provide integrated services but acknowledged that modifications to the program, including integration, was not required if it "would fundamentally alter the nature of the service, program, or activity." *Id.* at 336–37 (quoting 28 C.F.R. § 35.130(b)(7)). It concluded that integrating the plaintiff would not fundamentally alter the program. *Id.* at 338–39. The

department claimed it would cause a fundamental alteration because integrating plaintiff into the program would require the department to shift funds from the nursing care appropriation to the attendant care budget in the middle of a fiscal year and it was not permitted to shift funds after appropriation according to state law. *Id.* at 337. The court deemed this administrative hurdle was not a fundamental alteration of the program and noted the plaintiff was not asking the department to "alter its requirements for admission to the program, nor . . . that the substance of the program be altered to accommodate her." *Id.*

12. It stated,

The 504 coordination regulations, and the ADA make clear that the unnecessary segregation of individuals with disabilities in the provision of public services is itself a form of discrimination within the meaning of those statutes, independent of the discrimination that arises when individuals with disabilities receive different services than those provided to individuals without disabilities.

In Iowa, blind persons or partially blind persons have the same rights as other persons to full and equal accommodations, the same right to full use of public buildings, public elevators, public facilities and other public places, and have the right to be accompanied by a guide dog, so long as the dog is under control and especially trained for the purpose, in these places.

It is an unfair or discriminatory practice for any educational institution to discriminate on the basis of disability, including blindness, in any program or activity. Discriminatory practice includes exclusion of a person from participation in any academic, extracurricular, research, occupational training, or other program except athletic programs.

Instruction 12 advises,

The Federal Rehabilitation Act prohibits an otherwise qualified individual with a disability from being excluded from participating in or being discriminated against under any program or activity receiving federal assistance solely on the basis of her disability.

Instruction 14 provides,

The Americans with Disabilities Act provides that no individual shall be discriminated against solely on the basis of disability. Discrimination under the ADA encompasses not only intentional discrimination but also the discriminatory effects of benign neglect, apathy, and indifference, and it includes a failure to make reasonable modifications in policies, practices or procedures when such modification[s] are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities. "Reasonable accommodation" may include allowing a disabled individual the full use of his service animal in a place where pets are not normally allowed. A "reasonable accommodation" does not require changes that would fundamentally alter the nature of the service provided.

Dohmen's requested marshalling instruction was not a complete statement of the law applicable to the facts. Dohmen's instruction would have allowed the jury to find a violation of the ADA and Rehabilitation Act with no finding of unlawful discrimination. It essentially would have required a directed verdict because Dohmen was excluded from the program. But the issue for the jury was whether that exclusion was a result of discrimination prohibited by the ADA and Rehabilitation Act. Dohmen was not entitled to a directed verdict or an instruction stating that the department's offers of alternative training were per se discrimination under the applicable laws. Unlike the plaintiff in *Helen* who requested admission to a program without any accommodations, Dohmen asked the department to modify its program requirements and substance to accommodate her. At trial, the department director explained that Dohmen was not permitted to use her service dog in the program because the curriculum is based on a nonvisual theory and no student is permitted to use any visual aids, including service dogs.[13] He testified that no visual

---

13. He explained,

The whole basis of the orientation adjustment program at the Iowa Department for the Blind, it is, in the blindness field, referred to as the Iowa model. This is a—this is a model which was developed beginning in 1958. A director at that time, named Kenneth Jurnigan, developed and nurtured the Iowa model which we continue to use today. It is nonvisual to the extent that what we seek to do is to get individuals who have lost their eyes, either entirely or significantly enough so that things that they may have done at one time with vision, they no longer are able to do them effectively without vision.

aids are permitted because the theory of the program is to immerse students in blindness. Students learn to travel with use of a white cane as a guide. Using a sighted guide person or dog as a guide is considered a visual aid because the student is relying on the person's or dog's vision to travel. Nonvision is also maintained by using sleep shades or other tools to ensure students are not using any sight, even if they are not completely blind. Dohmen's request to use her guide dog was a request for a modification of the department's policy.

The court's instructions incorporated the applicable law on exclusion and discrimination. The jury was instructed that exclusion from programs is discrimination under the ADA, Federal Rehabilitation Act, and Iowa law, and that a failure to make reasonable modifications to integrate the plaintiff is also discrimination. According to the instructions, the jury could only return a verdict for the department if it determined either, (1) Dohmen was offered a reasonable accommodation by the de-partment and she refused the reasonable accommodation, or (2) the modification or accommodation requested by Dohmen was not reasonable because it would fundamentally alter the nature of the program. The fact that Dohmen was offered other options for training and she rejected these options does not change the legal principles the jury was to apply. The jury heard the facts and was instructed correctly. It was for the jury to determine whether the accommodations offered by the department were reasonable or unreasonable or whether Dohmen's requested accommodation required a fundamental alteration.

■ **B. Instructions on Offering Alternative Training.** Dohmen also claims "the trial court failed to properly instruct the jury that offering [Dohmen] training in Braille and computer in a separate program other than the Adult Orientation and Adjustment Center is a violation of her civil rights." She requested the jury be told,

It is nonvisual. It is nonvisual in that what we try to get people to understand is if you're blind, you can do anything you want to do. You can, if you have training and if you come to understand that it isn't eyes that make [ ] you anything, that is—that is, having vision allows you to see, period.

The nonvisual approach, then, works with individuals so that they come to understand that it is who they are as individuals. It is the kind of effort that they put forth as individuals. It's their personality. It's their intellect. It's access to education. It's a lot of other things that make up who and what a person becomes; but it is not—it is not visual. In other words, the key to the Iowa model is the idea that vision doesn't make you smarter; doesn't give you more energy. I can attest to that, certainly. It doesn't. It doesn't do anything for you except that it identifies for you that you don't see.

If we're working with people who are newly blinded or who are trying to come to grips with blindness, trying to understand blindness, the thing we want them to understand is that—is that lack of eyes means you do not see. What more does it mean? Nothing. Nothing. It simply means that you do not see. And what we seek to do is to fill that understanding with a positive attitude and with the skills you need in order to participate fully and effectively in society.

So the orientation adjustment program is at once key to the idea of nonvisual instruction and values and ideas and, in a practical way, seeks to transfer the blindness skills; for instance, Braille reading and writing, using assistive technology, putting voice on a computer, or using Braille output, traveling independently with a long cane, or whatever. That these are all blindness skills, and that the entire experience in the orientation adjustment program is one that is key to nonvisual instruction.

You are instructed that notwithstanding the existence of separate or different programs or activities, the Department cannot deny the opportunity for plaintiff to participate in programs or activities that are not separate or different.

Nor was plaintiff required to accept any accommodation, aid, service or benefit that she chose not to accept.

When separate programs are offered to a person with a disability, that person cannot be denied the opportunity to participate in programs that are not separate or different. Separate, special or different programs that are designed to provide a benefit to persons with disabilities cannot be used to restrict the participation of persons with disabilities in general, integrated activities. Modified participation for persons with disabilities must be a choice, not a requirement.

The judge denied the requested instruction.

We agree with Dohmen that the requested instruction is a correct statement of the law. *See* 28 C.F.R. 35.130(d)(e). This law also was not incorporated into other instructions given to the jury. However, the court did not err in denying the request because, as the department points out, this law does not apply to the facts of this case. Dohmen was never denied full and integrated participation in the Adult Orientation and Adjustment Center. She was admitted into the program but had to participate, as did the other participants, without a guide dog. She rejected full participation in the program but was not denied it. Also, she was not forced to accept separate programming. The department offered alternative programming, and she chose not to accept the separate training. These facts are not under dispute. Since Dohmen was not denied the opportunity to participate in the program and was not required to accept

alternative training, the instruction did not apply and the court was correct in denying Dohmen's request.

■ **C. Reasonable Accommodation Instructions.** Dohmen next contends the court erred in instructing on "reasonable *accommodations*" when it should have instructed on "reasonable *modifications*." Dohmen requested the following instruction,

Pursuant to the ADA and sec. 504, an entity providing services thereunder is required to make reasonable modifications in policies, practices and procedures when such modifications may be necessary to afford any goods, services, facilities, privileges, advantages, or accommodations, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

The court denied this request but incorporated the law on reasonable accommodations and modifications in other instructions. In the marshalling instructions for Dohmen's Iowa civil rights, Rehabilitation Act, and ADA claims, the court set forth the elements for a prima facie case and then instructed,

If Plaintiff has established her claim by proving the above elements, the Defendant is then allowed to prove some legitimate, nondiscriminatory reason for its action which would defeat the Plaintiffs ... claim. If Plaintiff needed a reasonable accommodation to attend the Center, and she was offered a reasonable accommodation by the Defendant and refused this reasonable accommodation, she cannot recover on this claim. If, however, the Plaintiff shows that the accommodation offered by the Defendant was not needed or was not reasonable, she may still recover on this claim.

Instruction 14 advised the jury that "discrimination" under the ADA "includes a failure to make reasonable modifications in policies, practices or procedures when such modification[s] are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities." It also stated:

> "Reasonable accommodation" may include allowing a disabled individual the full use of his service animal in a place where pets are not normally allowed. A "reasonable accommodation" does not require changes that would fundamentally alter the nature of the service provided.

Dohmen contends her requested instruction was a correct statement of the law because it was modeled on a specific regulation requiring reasonable modifications for disabled individuals.[14] She also argues that the "reasonable accommodation" language applies to disability discrimination

claims in the employment context and "reasonable modification" instructions should be given in disability discrimination cases involving the provision of services. The department contends Dohmen cannot complain of the instructions on "reasonable accommodation" because she used the term in some of her requested instructions and did not make this specific complaint below to preserve error.

We tend to agree with the department and cannot ascertain from the record where Dohmen objected to the term "reasonable accommodation." We also question whether the regulation cited by Dohmen applies to the facts of this case since it pertains to private entities providing public accommodation, and public entities are excluded from this part, Title III, of the ADA.[15] However, under the applicable regulation, a public entity is required to:

> make reasonable modifications in policies, practices, or procedures when the

---

14. The regulation provides in part:

General. A public accommodation shall make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the public accommodation can demonstrate that making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations.

28 C.F.R. § 36.302(a).

15. Title III of the ADA prohibits discrimination of the basis of disability by *private entities of public accommodation*. "Place of public accommodation" is defined as "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the following categories ... (10) ... other place of education." 28 C.F.R. § 36.104. Another rule states that the regulations for Title III of the ADA do not apply to a "public entity." 28 C.F.R. 36.102. "Public entity means (1) Any State or local government; [or](2) Any department, agency, special purpose district, or other instrumentality of a

State or States or local government." Even though Dohmen cites regulations and cases about Titles I and III of the ADA, it appears she is actually making a claim under Title II, which prohibits discrimination by public entities:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Accordingly, even though the parties do not raise this issue, it is questionable whether the regulations Dohmen cites to support her proposed instructions even apply to the Iowa Department for the Blind. We do note under Iowa civil rights law, "Public accommodation" does include any entity that "receives governmental support or subsidy ..." and "includes each state and local government unit or tax-supported district of whatever kind, nature, or class that offers services, facilities, benefits, grants or goods to the public, gratuitously or otherwise." Iowa Code § 216.2(12).

modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

In our research of disability claims in an educational setting, "reasonable accommodation" and "reasonable modification" are not distinguished or are used interchangeably. *See, e.g., Mark H. v. Lemahieu,* 513 F.3d 922, 937 (9th Cir.2008) (explaining that the Rehabilitation Act and ADA require state education departments to make "reasonable modifications" in order to provide disabled individuals meaningful access to education); *Weixel v. Bd. of Educ.,* 287 F.3d 138, 148 (2nd Cir.2002) (referring to plaintiff's claim under the ADA as an allegation that school officials refused to make "reasonable accommodations" for a disabled student); *Kaltenberger v. Ohio Coll. of Podiatric Med.,* 162 F.3d 432, 436 (6th Cir.1998) (in evaluating whether summary judgment was appropriate in a claim of a school's violation of the Rehabilitation Act, ADA, and Ohio civil rights laws, stating, "[c]ourts must also give deference to professional academic judgments when evaluating the reasonable accommodation requirement").

Dohmen correctly asserts that "reasonable accommodations" and "reasonable modifications" were distinguished in *Johnson v. Gambrinus Co./Spoetzl Brewery,* 116 F.3d 1052, 1059 (5th Cir.1997). Yet, it is a distinction that makes no difference in the circumstances before us. In *Gambrinus,* the court noted "reasonable accommodations" pertain to disability discrimination cases in employment under the ADA and "reasonable modifications" pertain to disability discrimination in areas of public accommodation, such as the brewery tour at issue in the case. *Johnson,* 116 F.3d at

1059. It went on to define how each is an affirmative defense.

The language of both provisions is very similar: Title I defines discrimination to include "not making reasonable accommodations ... unless [the defendant] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Title III defines discrimination to include "a failure to make reasonable modifications ... unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [the public accommodation]." *Id.* § 12182(b)(2)(A)(ii). In light of the statutes' parallel language, we find no basis for distinguishing their respective burdens of proof. While Title I provides an undue hardship defense and Title III provides a fundamental alteration defense, fundamental alteration is merely a particular type of undue hardship. *See* 29 C.F.R. pt. 1630 app., § 1630.2(p). Consequently, while the scope of the affirmative defense under Title Ml is more narrow than that provided by Title I, the type of proof—that is, proof focusing on the specific circumstances rather than on reasonableness in general—is the same.

*Id.* In the case at hand, even if the district court used the term "reasonable accommodation," but should have used the word "reasonable modification" in the instructions, it defined it with the proper legal standard, explaining the defendant was not required to make "changes that would fundamentally alter the nature of the service provided." Since the court correctly instructed the jury on the more narrow definition of "reasonable modification," even though it termed it "reasonable accommodation," no prejudice occurred.

■ **D. Service Animal Instruction.** Dohmen next contends the court erred in

denying her requested instructions on a person's civil right to use of a service animal. She requested the jury be told,

An entity operating under the ADA and sec. 504 is required to modify policies, practices and procedures to permit the use of a service animal by an individual with a disability. The law intends that the broadest feasible access be provided to service animals in all places of public accommodation. The intent of the law is that the entity must take the necessary steps to accommodate service animals, and to ensure that individuals with disabilities are not separated from their service animals.

Dohmen also asked for the marshaling instructions to state that Dohmen claimed the department violated the law "[i]n failing to make reasonable modifications in policies, practices and procedures in order to ensure that [Dohmen] is not separated from her service dog ... while receiving training in Braille and computer usage from [the department]." Dohmen again cites a regulation promulgated under the ADA and its accompanying comments for support.

We agree that Dohmen's requested instructions are a correct statement of law based on regulations and commentary. However, the commentary Dohmen requested the jury be informed of does not change the applicable legal standard. The regulation provides, "[g]enerally, a public accommodation shall modify policies, practices or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1). The accompanying explanatory comments do state:

[t]his formulation reflects the general intent of Congress that public accommodations take the necessary steps to accommodate service animals and to ensure that individuals with disabilities are

not separated from their service animals. It is intended that the broadest feasible access be provided to service animals in all places of public accommodation, including movie theaters, restaurants, hotels, retail stores, hospitals, and nursing homes.

Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed.Reg. 35,544–01, 35,565 (July 26, 1991). The comments also clarify that this intent does not change the overall legal standard to be applied in the case of service animals, stating:

The section also acknowledges, however, that, in rare circumstances, accommodation of service animals may not be required because a fundamental alteration would result in the nature of the goods, services, facilities, privileges, or accommodations offered or provided . . . .

*Id.* Dohmen was not entitled to a special instruction on her right not to be separated from her service animal. The court correctly instructed the jury that blind persons "have the same rights as other persons to full and equal accommodations ... and have the right to be accompanied by a guide dog." It also instructed that a " 'reasonable accommodation' may include allowing a disabled individual the full use of h[er] service animal in a place where pets are not normally allowed ... [but] does not require changes that would fundamentally alter the nature of the service provided." We find no error in denying this requested instruction.

**VI. CONCLUSION.** We affirm the district court's denial of the department's motion for summary judgment. It waived its challenge to Dohmen's failure to exhaust administrative remedies and this became the law of the case following the first appeal. We also find the court did not err in denying the motion to dismiss on the department's claim of sovereign immunity.

We affirm the district court's denial of Dohmen's motion for a new trial. The district court did not err in refusing to give her requested instructions.

**AFFIRMED.**